# EXHIBIT A

8/27/15

## CA Form 1

## Superior Court of the District of Columbia
### CIVIL DIVISION
**500 Indiana Avenue. N.W., Room JM-170**
**Washington, D.C. 20001  Telephone: 879-1133**


received
8 27, 2015

| LaWanda Britt |
|---|
*Plaintiff*

vs.

Civil Action No. 2015 CA 004967 B

| Federal Nat'l Mortgage Ass'n |
|---|
*Defendant*

### SUMMONS

To the above named Defendant:

　　You are hereby summoned and required to serve an answer to the attached Complaint either personally or through an attorney. within twenty (20) days after service of this summons upon you exclusive of the day of service.  If you are being sued as an officer or agency of the United States Government or the District of Columbia Government  you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you  The attorney's  name and address appear below. If plaintiff has not attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

　　You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue  N.W. between 9:00 am. and 4:00 p.m.. Mondays through Fridays or between 9:00 am. and 12:00  Noon on Saturdays. You may file the original Answer with the Court either before  you serve a copy of the Answer on the  plaintiff or within five (5) days after. you have served the plaintiff. If you fail to file an Answer. judgment by default may be  entered against you for the relief demanded in the complaint.

Clerk of the Court

| Leizer Z. Goldsmith |
|---|
Name of Plaintiff's Attorney

Address
| 5335 Wisconsin Ave., NW Suite 440 Washington, DC  20015 |
|---|

By _____
Deputy Clerk

Date | 07/02/2015 |

Telephone | (202) 895-1506 |

**PUEDE  OBTENERSE  COPIEAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA. 500 INDIANA AVENUE, N.W., SALA JM-170**

**YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF  D.C., 500 INDIANA AVENUE  N.W., ROOM JM 170**

Form CV(6)-456/Mar. 98

NOTE: SEE IMPORTANT INFORMATION ON BACK OF  FORM.

IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY *THE JUDGMENT. IF* YOU INTEND  TO OPPOSE THIS ACTION, *DO NOT FAIL  TO ANSWER WITHIN  THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (628-1 161) or the Neighborhood Legal Services          for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

LAWANDA BRITT

Vs.                                              C.A. No.        2015 CA 004967 B

FEDERAL NATIONAL MORTGAGE ASSOCIATION
## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to: Judge JEANETTE J CLARK
Date:  July 2, 2015
Initial Conference: 9:30 am, Friday, October 02, 2015
Location:  Courtroom 221
          500 Indiana Avenue N.W.

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties, (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc

Filed
D.C. Superior Court
07/02/2015 18:35PM
Clerk of the Court

## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **LAWANDA BRITT,**<br>5008 70th Ave.<br>Hyattsville, MD 20748 | |
| Plaintiff, | Case No.: 2015 CA 004967 B |
| v. | **JURY TRIAL DEMANDED** |
| **FEDERAL NATIONAL MORTGAGE ASSOCIATION,**<br>3900 Wisconsin Ave NW,<br>Washington, DC 20016, | |
| Defendant. | |

### COMPLAINT OF DISCRIMINATION AGAINST FANNIE MAE

#### I.    JURISDICTION

1.    Plaintiff LaWanda Britt is a female resident of Maryland.

2.    At all times relevant to this action, she was employed by Defendant Federal National Mortgage Association ("Fannie Mae").

3.    Britt's employment at Fannie Mae was entirely within the District of Columbia at all times.

4.    This Court has subject matter jurisdiction over all claims under District and Federal law stated herein.

5.    This Court is the proper venue for these claims.

#### II.    EXHAUSTION OF REMEDIES & TOLLING

6.    Britt filed a charge with the EEOC on November 2, 2012.

7.    Britt amended her charge on January 11, 2013, to add that she believed she had been discriminated against based on her Religion, that she had been denied a reasonable accommodation for Ramadan, and that her attendance had been monitored strictly by Wilson.

8.    On information and belief, this EEOC charge was cross filed with the D.C. Office of Human Rights.

9.    Britt therefore exhausted her administrative remedies under Title VII and the D.C. HRA.

10.    The EEOC issued a notice of right to sue on December 9, 2013.

11.    Britt sought arbitration at JAMS pursuant to the arbitration agreement between the parties on March 6, 2014; i.e., within 87 days of the issuance of the right to sue letter from the EEOC.

12.    Accordingly, she has exhausted her administrative remedies pursuant to Title VII and the DCHRA.

13.    No particular administrative remedies need be exhausted under Section 1981.

14.    Under the arbitration agreement, the Plaintiff has 30 days from the date of the final award to reject the award.

15.    The final award from the JAMS arbitrator was issued on May 5, 2015.

16.    Plaintiff rejected that award on May 18, 2015.

17.    Under the arbitration agreement, Defendant agrees to toll the statute of limitations for 60 days after a final award that has been rejected.

18.    Plaintiff brings these claims within 60 days of the May 5, 2015 rejected award.

19.    Accordingly, the claims presented here are timely under the tolling agreement between the parties.

### III.    FACTS

#### A.    Background

20.    LaWanda Britt (African-American, Muslim) entered on duty for Fannie Mae in around 2005, working in the Records Management field.

21.    In 2008 or 2009, Michelle Rush (African-American) became Britt's supervisor.

22.    In 2011, Jaci Myers (White, non-Muslim) took over the Records Management business unit as the director and then managing director.

23.    Myers hired Erica Wilson (African-American, non-Muslim) as director and Sonia Trask (African-American, non-Muslim), who then became Britt's second-line and first-line supervisors, respectively.

24.    Sonia Trask managed the offsite storage program in the latter half of 2011 and in 2012.

25.    Wilson and Myers may also have done some management.

#### B.    Trask's Mismanagement

##### 1.    Trask's behavior

26.    Trask repeatedly stomped around the office, sat on Britt's desk in a demeaning manner, screamed at Britt, and belittled Britt.

27.    Trask also told Britt that "people in England — if [you] w[ere] in England, . . . [you] would be considered privileged and people of [Trasks's] skin tone were treated differently."

28.    Britt had no idea why Trask spoke to her about her skin tone and the way people treated her.

29.    Britt believed that she was being subject to reverse discrimination by Trask, who was now in a position of power over someone with lighter skin.

30.    As described by Rush, Trask was "very in [Britt's] face a lot", "hovering over her" and, "there was a lot of close physical contact in LaWanda's cubicle that [Rush] observed on several occasions."

31.    Britt felt "overwhelmed" and that this was "horrific."

32.    The way that Trask had been treating her made Britt feel like "[she] was [Trask's] slave[,]" that "she owned [Britt] basically" and that Britt was "her property" because "sitting on the desk doing whatever she wanted to [Britt] didn't matter to her."

33.    Trask did this at least "weekly" if not "constantly."

34.    Trask never took similar intimidating actions against anyone else.

35.    There appeared to be no reason for Trask to do this, as there was a guest chair available.

36.    Libbie Rozofsky, a co-worker in the same area as Britt, described Trask's conduct as "loud and crazy" and as creating a "hubalabub," and "kind of crazy."

37.    Rozofsky believes Trasks's past conduct toward Britt to be "extremely inappropriate" and confessed that if someone had treated her that way, Rozofsky "would have been horrified."

38.    Rozofsky feels that "[y]ou do not treat another person that way, especially one that you managed" and that Trask's conduct was "a human violation."

39.    Rozofsky told Britt that she should "[g]o and report it" to FM Ethics.

40.    Trask's behavior towards Britt was so demeaning that Rozofsky herself reported Trask anonymously to FM Ethics, Fannie Mae's in-house ethics unit.

### 2.    Britt Protests Trask's Behavior

41.    Britt herself reported Trask's behavior to FM Ethics in January 2012.

42.    Britt also reported Trask's behavior to others, including her management.

### a. Wilson

43. Britt protested Trask's conduct, telling Wilson "how [she] was feeling in reference to the way Sonia had been treating [her]. [That she] was being discriminated against . . . [and] how Sonia talked about [her] color . . . sitting on [her] desk."

44. Britt used the terms "discrimination" and "harassment" with Wilson.

45. Wilson admits that Britt protested Trask's treatment to her.

### b. Myers

46. Britt also reported Trask's behavior to Myers on several occasions.

47. Britt informed Myers of Trask's discussion of her skin tone and informed Myers that she felt that Trask was discriminating against her.

48. Britt stated to Myers that Trask "referenced people of a lighter skin in England were more privileged than people of darker skin and how I thought that was very discriminatory towards me. As though I was being discriminated against."

49. Myers walked out of the meeting when Britt stated this, claiming that she had to go to another meeting.

### c. Ramsey

50. Britt reported Trask's conduct to Gary Ramsey in FM Ethics, stating that she felt that it was reverse discrimination by Trask and that she was being tortured and harassed.

51. Britt reported to Wilson that she felt that she was being discriminated against by Trask.

52. Britt spoke with Mike Kraft of FM Ethics and informed Kraft that she felt that she was facing "reverse discrimination, I was being harassed, discriminated against, tortured" by Sonia Trask.

53.    Kraft admits that he had a discussion with Britt concerning Britt's interactions with Trask.

54.    Despite these reports, Fannie Mae took no action against Sonia Trask.

C.    **Myers Assigned Britt Responsibility for Dashboard**

55.    In early 2012, Myers assigned to Britt the task of creating a management dashboard.

56.    This management dashboard was intended to collect and to summarize data about offsite storage.

57.    At the outset, Britt was enthusiastic about producing a dashboard.

58.    Britt had never taken a class or been trained in management reporting.

59.    Britt produced drafts of this dashboard for review by her supervisors.

D.    **February 28 Meeting**

1.    **2/28 Meeting**

60.    On February 28, 2012, Myers held a meeting with the Records Management team including Britt.

61.    During this meeting, Myers was angry and emotional.

62.    Myers used the word "shit" multiple times during this meeting.

63.    Employees present at the meeting felt that Myers's comments were directed at particular members of the Records Management team.

64.    Wilson, who was present in this meeting, later failed to disclose to Investigations that she heard Myers use the word "shit" during this meeting.

2.    **Britt Described Myer's Conduct as Treating her Like a Slave**

65.    Britt met with Megan Gaither (FM HR) and Michelle McCarthy (FM Investigations) after the February 28 meeting.

66.   Britt described to McCarthy and Gaither that she felt that she was being discriminated against and that she felt that she was being treated like "Kunta Kinte" and a "slave."

67.   Fannie Mae took no action to end Trask's treatment of Britt

68.   Britt spoke with Jennifer Collins (FM Ethics) in June 2012 and informed her that Trask's behavior was continuing.

69.   Collins forwarded this information to FM Investigations.

70.   FM Investigations did nothing about this.

71.   In April 2012, FM Ethics produced a report about the complaints about Trask and Myers together.

72.   This report was provided to Human Resources and Myers's direct manager.

73.   On information and belief, Myers was aware that Britt had complained of discrimination against Myers and Trask.

### 3.   Myers refused Britt's Dashboard Drafts

74.   After this time, Myers did not provide Britt any feedback on her Management Dashboard drafts that she saw.

75.   Myers rejected all of the drafts she received because she alleged they were not what she wanted in the draft.

76.   Myers never stated or provided notes to Britt concerning what Britt could do to improve the dashboards.

77.   Wilson never asked Myers what she wanted to see in the dashboard.

78.   Britt also reached out to a vendor to produce a dashboard, but Myers and Wilson denied Britt this assistance.

79. Wilson came to Britt at some point prior to Britt's Midyear review on July 20, 2012, and informed Britt that "this is not what Jaci wanted" and reassigned Britt from the project.

80. Lisa Summers, who was Myers's supervisee, regularly received feedback as part of drafting documents for Myers.

81. Other employees regularly received feedback.

82. Myers marked Britt's dashboard project as incomplete in the team's weekly status updates.

83. Myers threatened to inform higher management that Britt was not completing her project.

84. On information and belief, Myers set Britt up to fail this project to justify her later termination.

E.    **Britt Protested Repeatedly Wilson's Failure to Provide Ramadan Accommodations.**

85. Ramadan is the holy month for Muslims.

86. Ramadan requires adherents to fast during daylight hours.

87. Ramadan is also an important time to be with family.

88. In 2012, Ramadan started July 19, 2012, and lasted through August.

89. In June 2012, Britt sought changes to her daily work schedule as an accommodation for Ramadan.

90. Britt requested that her hours be changed from 9:30 to 6:00 to the hours of 7:30 to 4:00 so that she could be at home for the Maghrib prayer, the final prayer before the end of fasting.

91. Britt made this request to Erica Wilson and others in her management chain.

92. Britt was directed to make this request also to Marian Stevens in Fannie Mae's HR Department.

93.   On July 12, 2012, Stevens emailed Britt and asserted that "to date, you have not provided me with any information that your request for accommodation (earlier hours) is based on your sincerely held religious belief as opposed to a convenience for yourself."

94.   Stevens did not inform Britt that her request for Ramadan accommodations was denied.

95.   Wilson never informed Britt that Stevens's email represented the final word of Fannie Mae on her request for accommodations for Ramadan.

96.   Britt believed that Wilson had the final say in whether she would receive accommodations.

1.   7/18 Meeting

97.   On July 18, 2012, Britt met with Wilson to discuss her request for an accommodation.

98.   Wilson told Britt that: "Lawanda, your inability to work independently, I cannot accommodate your request to change your hours for Ramadan."

99.   Britt informed Wilson that she would work 8:30–5, Fannie Mae's core hours.

100.   Wilson had never before stated that Britt was unable to complete her tasks independently.

101.   Britt in fact completed her tasks independently every day and had done so since she was hired by Fannie Mae.

102.   Wilson informed Britt that she would be monitored by Wilson, stating that Britt would have to check in during the morning and in the evening.

103.   After the meeting, Wilson emailed Britt concerning the meeting.

104.   The email from Wilson stated that Britt's request to modify her hours was approved under the conditions that Britt "send an email notification in the morning when you arrive to

the office, at the end of the day, and if you are away from your desk for a significant period of time."

105. Britt responded the same day to Wilson's email by objecting to Wilson's requirement of checking in with her during the day, stating that her coming to work on time had never been an issue.

106. On the following day, July 19, 2012, Wilson responded that "since your request to modify your work hours due to a religious accommodation was denied by Human Resources I agreed to alter your hours to 8:30-5 going forward. Given your inability to independently complete project tasks (i.e. Out on Reference, Offsite Storage Dashboard, etc.) this is one of the conditions I am requiring." Ex. 173.

107. Wilson was aware that there was no aspect of Britt's assigned duties concerning Out on Reference or the Offsite Storage Dashboard that Britt could not independently complete.

108. Britt was not working on Offsite Storage Dashboards at that time.

109. Britt's performance was rated as "on track" and "on course" in all categories and overall just two days later on July 20, 2012.

110. No other employee was required to check in in the morning, when leaving his desk for a significant period of time, or at the end of the day.

111. Wilson's allegation that Britt was unable to complete her project tasks was unfounded and a pretext for denying Britt her accommodation.

## 2. 7/19 Trask discussion

112. On July 19, 2012, Britt discussed with Trask Wilson's failure to accommodate Britt's request for a change in her work hours for Ramadan.

113. Trask secretly took notes on this conversation and forwarded the conversation to Wilson and Myers.

114. In this email, Trask provides notes stating: "[Britt states she] cannot go through Ramadan with this unfair treatment and issues. It was not fair she was unable to change her hours due to Ramadan and unfair about being told she cannot work independently - Erica told her this on 7/18 and she was not feeling well at the time and she is not feeling well now."

115. Trask sent an email with her notes on her discussion with Britt to Myers, Wilson, and Gaither.

116. Wilson and Myers received this emailed document and read it.

### 3.      Britt Emailed Collins

117. Britt emailed Collins in Investigations and informed her that her Ramadan accommodations had been denied.

118. Collins forwarded this information to Investigations.

119. Collins did not pursue the matter further because Investigations had the same information already.

120. Fannie Mae lost Collins's email concerning this discussion.

### F.      Britt Was Given Good Review on July 20, 2012.

121. On July 20, 2012, Britt met with Wilson and Gaither to discuss Britt's midyear performance review.

122. As part of that review, Wilson provided Britt with a paper copy of her midyear review.

123. Britt's midyear review indicated that she was "on track" or "on course" to meet all of her performance objectives and behaviors by the end of the year.

124. During the mid-year review meeting, Britt presented Wilson with a memorandum.

125. Rush provided Britt assistance in writing this memorandum, crafting the words that Britt stated.

126. In this memorandum, Britt asserted that Wilson had falsely stated that she was unable to work independently and that Wilson had set her up to fail.

127. This memorandum contradicted the asserted bases that Wilson provided were the reasons Wilson denied Britt her requested change in hours for Ramadan.

128. Wilson discussed this memo with Gaither, who also received a copy during the mid-year meeting.

129. Wilson discussed this memo with Myers, who read the memorandum after Britt's mid-year meeting.

130. Wilson did not believe that Britt had written this document on her own.

131. Wilson believed that the only other person who could have assisted Britt in writing this memo was Rush.

132. After receiving this memo, Wilson called Britt and Rush to confirm that Rush was assisting Britt in writing a separate document, stating to both "I know [Rush's] writing."

133. Within three weeks, by August 7, 2012, Wilson had determined to terminate Rush.

G.    **Wilson Gives Britt an "Individual Development Plan"**

134. Fannie Mae's "Human Resources Policy and Practice handbook" includes a section called "Performance Improvement."

135. In this section, this handbook states "Mangers are strongly urged . . . to notify an employee of any concerns, and to take appropriate steps to address performance deficiencies as soon as they are detected."

136. The handbook also states in this section "Employees have optimal opportunity to improve if they are made aware of the specific problems with their performance and given suggested steps to improve."

137. Fannie Mae's handbook also states that a manager can aid the process by being "proactive," listing: "Identify the area(s) of deficiency and work with the employee to identify any possible causes of the problem[;] . . . develop a plan to improve performance[; and] allow the employee a reasonable opportunity to improve before taking additional disciplinary action[.]"

138. Wilson provided Britt with a document termed "Individual Development Plan" around the time of Britt's midyear review.

139. Wilson admits that this individual development plan is not a performance improvement plan.

140. Wilson did not provide Britt with any other feedback about her performance after providing her with the individual development plan around July 2012.

141. Wilson did not provide Britt with any steps to take to improve her performance after providing her with the individual development plan around July 2012.

142. Wilson claims that she provided this individual development plan because Britt had "deficiencies that she needed to work on to continue being successful."

143. Fannie Mae's policy recommends that managers: "Provide specific examples of the unsatisfactory performance."

144. The IDP contains no examples of past or present unsatisfactory performance and the term "unsatisfactory" or any synonym is not contained within the individual development plan Wilson gave to Britt.

-14-

145. This development plan included no written instructions in the "action plan" and Wilson did not work with Britt to develop such a plan.

146. This development plan asks Britt to draft 2–3 dashboard management reports concerning off-site storage.

147. Britt was no longer working on dashboard management reports concerning offsite storage at the time the IDP was provided to her.

### H.    Wilson Discusses Terminating Britt and Rush with Myers

148. Wilson's August 7, 2012 notes reflect that she, Myers, and Gaither (HR) discussed Britt and Rush, noting under Rush: "termination based on attendance . . . consider terminating MR first then Britt to identify potential additional performance concerns. . . . Draft documents by Friday."

149. Wilson's August 7 notes also list next to LaWanda Britt's name "– Midyear on track[,] things Sonia discovered[;] –Megan to forward template[;] . . . –lack of controls[;] –code of conduct violation."

150. Rush, the only other employee whose name appears on these notes, was marked as "off track" in her mid-year (although she received on-track and on-course for all of her performance and behavior measurements); but Britt was marked as "on track."

151. These notes indicate that these individuals sought to manufacture reasons for terminating Britt and even to delay Britt's termination to make them appear to be unconnected.

152. On information and belief, these notes indicate that Wilson, Myers, and Gaither discussed terminated Britt within three weeks of her protests concerning Ramadan and the reasons she was not accommodated.

-15-

153.  Wilson's notes on August 8, 2012, state "Review MR termination letter[;] - letter not strong enough, will provide additional guidance[.]"

154.  On Thursday August 9, 2012, Wilson sent an email to Myers and Gaither entitled "CONFIDENTIAL – HIGHLY RESTRICTED: Justification Termination" with the attachment "MR Justification Termination Template.doc" with the body text: "Please see the attached for MR. We can discuss further. The one for LB is forthcoming by end of business today."

155.  Wilson and Myers both claim that they do not now know what the meaning of "the one" in the context of this email is.

156.  Neither the handwritten notes nor the email from Wilson described above were produced during discovery in the arbitration for Britt.

157.  Under the JAMS arbitration rules applicable to Britt's arbitration case, "all Parties continue to be obligated [during the arbitration] to provide relevant, nonprivileged document . . . ."

158.  Attached to Wilson's August 9 email was a two-page memorandum justifying the termination of Michelle Rush based on tardiness.

159.  The only way for Wilson to know whether Rush had been tardy was to have a "badge report" obtained from the security office.

160.  Wilson did not receive a badge report between July 13, 2012, and August 10, 2012.

161.  Myers denies that she and Wilson discussed terminating Rush at that time on or before July 13, 2012.

162.  Wilson does not now recall when she first determined to terminate LaWanda Britt after July 20, 2012.

163.  The first time Wilson and Myers discussed terminating Rush is after Wilson received Britt's July 20, 2012 memorandum.

164.  Wilson fired Rush on August 28, 2012, allegedly because Rush was unable to get to work on time.

I.    **Wilson Fires Britt**

165.  On October 4, Wilson signed the final memorandum "Justification for Termination of LaWanda Britt."

166.  In this memorandum, Wilson provides "examples" of the Britt's alleged performance deficiencies.

167.  Wilson faulted Britt in the termination memo for being unable to produce a management dashboard.

168.  Wilson now admits that Britt was not working on the management dashboard after Britt was provided with her individual development plan.

169.  Wilson faulted Britt in the termination memo for a lack of adequate controls in off-site storage, leading to more than 1000 boxes of documents being lost, not policing access to the off-site storage database, and causing an off-site storage issue to be identified in an audit.

170.  Wilson now denies Britt was the cause of the boxes referred to in the memorandum being lost.

171.  Britt was not responsible for authoring the procedures for off-site storage that would have required policing access better.

172.  Britt did in fact police internal access to the off-site storage database.

173.  Other than asking for Britt to produce "2–3 Summary Dashboard Reports related to Offsite Storage Activities", Wilson's individual development plan did not identify any of these alleged deficiencies in any manner.

174. On October 23, 2012, Wilson formally fired Britt from Fannie Mae allegedly because of performance.

## IV.     STATEMENT OF CLAIMS

175. Plaintiff incorporates by reference all of the above-stated paragraphs as if fully stated herein.

### Count I—Religious Discrimination in Employment Termination, in Violation of Title VII and the D.C. Human Rights Act.

176. Plaintiff incorporates by reference all of the above-stated paragraphs as if fully stated herein.

177. Britt is Muslim.

178. Non-Muslim Fannie Mae managers terminated Britt's employment.

179. Fannie Mae replaced Britt with a non-Muslim.

180. Wilson and Myers were aware of Britt's religion because of her requests for religious accommodations.

181. The reasons asserted for Britt's termination are pretextual and not the real reasons for her termination.

182. Defendant fired Britt because of her religion.

183. Fannie Mae's termination of Britt because of her religion constituted unlawful religious discrimination in violation of Title VII and the DCHRA.

### Count II: Retaliation in Employment Termination, in Violation of Title VII, 42 U.S.C. §1981 and the D.C. Human Rights Act. Retaliation under DCHRA, 42 U.S.C. 1981 and Title VII.

184. Protesting race and color discrimination is a protected activity under DCHRA and Title VII.

185.  Protesting harassment based on color is a protected activity under Title VII, 42 U.S.C. §1981 and the DCHRA.

186.  Failing to make a reasonable religious accommodation is a violation of Title VII and the DCHRA.

187.  Britt engaged in protected activity by reporting Sonia Trask's conduct to her supervisors, FM Ethics, and FM Investigations and describing it as discriminatory.

188.  Britt again undertook  protected activity by requesting Ramadan accommodations which were denied.

189.  Britt engaged in still more protected activity by challenging Wilson's reasons for denying her request for Ramadan accommodations..

190.  But for Britt's protest against Wilson's failure to provide her with religious accommodations, Wilson would not have terminated Britt's employment.

191.  Indeed, Wilson determined that she would terminate Britt within just three weeks after Britt's protected protests concerning her request for Ramadan accommodations.

192.  The reasons Wilson asserts for terminating Britt are not truthful.

193.  Wilson terminated Britt because Britt engaged in protected activity under Title VII, 42 U.S.C. §1981 and the DCHRA.

194.  Wilson acted as Fannie Mae's agent in terminating Britt.

195.  Fannie Mae's firing of Britt because of Britt's prior protected activity constitutes unlawful retaliation in violation of the DCHRA, 42 U.S.C. 1981and Title VII.

### Count III— Unlawful Hostile Working Environment under Title VII and the DCHRA.

196.  Under the DCHRA, 42 U.S.C. 1981 and Title VII, it is unlawful for an employer to create a hostile working environment based on color.

197.  Trask harassed Britt because of Britt's color.

198.  Trasks's actions against Britt constituted a hostile working environment based on her color.

199.  Britt's and Trasks's supervisors were made aware of informed that Trask's conduct was creating this hostile working environment, by multiple employees.

200.  Wilson and Myers (along with FM Ethics and Investigations) took no action to correct Trasks's unlawful behavior against Britt.

201.  Fannie Mae created and allowed a hostile working environment based on color, thereby violating Title VII and the DCHRA.

### Count IV — Failure to Provide Reasonable Religious Accommodations under Title VII and the DCHRA.

202.  Britt is Muslim.

203.  Under Title VII and the DCHRA, Fannie Mae was required to provide employees with reasonable accommodations for their religious practices.

204.  Britt requested a reasonable accommodation to change her hours for Ramadan.

205.  Fannie Mae failed to provide this reasonable accommodation.

206.  Fannie Mae's failure to provide Britt with a reasonable accommodation for Ramadan constituted discrimination under Title VII and the DCHRA.

## V.  REMEDIES

**WHEREFORE,** the Plaintiff prays that the Court grant Ms. Britt the following relief:

a.  A declaratory judgment that Defendant's conduct violated her rights;

b.  An order from this Court restoring Britt to her position at Fannie;

c.      Compensatory damages against Defendants, for emotional, non-pecuniary harm resulting as a consequence of Defendant's unlawful actions, in a precise amount to be determined by the jury;

d.      Compensatory damages, for consequential financial harms incurred by Plaintiff as a result of Defendants' unlawful actions, including but not limited to lost wages and benefits, including overtime pay, and future lost wages and benefits;

e.      Punitive damages in an amount to be determined by the jury;

f.      Prejudgment and post-judgment interest;

g.      Reasonable attorneys' fees, expenses and costs, as specifically authorized by statute, to be calculated by the Court pursuant to the established procedures and precedents; and

h.      Such further and other relief as the court shall deem just and proper.

## VI.    DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all issues so triable.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC

/s/

Leizer Z. Goldsmith    D.C. Bar No. 419544
Kyle G. Ingram         D.C. Bar No. 994849
5335 Wisconsin Avenue, N.W., Suite 440
Washington, D.C. 20015
Telephone: (202) 895-1506
Facsimile: (202) 318-0798
Counsel for Plaintiff LaWanda Britt

# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH

### INFORMATION SHEET

LaWanda Britt

vs

Federal National Mortgage Association

Case Number: 2015 CA 004967 B

Date: July 1, 2015

☐ One of the defendants is being sued in their official capacity.

| Name: *(Please Print)* Leizer Z. Goldsmith | Relationship to Lawsuit |
|---|---|
| Firm Name: Goldsmith Law Firm, LLC | ☒ Attorney for Plaintiff |
| | ☐ Self (Pro Se) |
| Telephone No.: Six digit Unified Bar No.: (202) 895-1506     419544 | ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury    ☐ 6 Person Jury    ☒ 12 Person Jury
Demand: $ 5001 plus amount to be determined by jury    Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: _____ Judge: _____ Calendar #: _____

Case No.: _____ Judge: _____ Calendar#: _____

---

**NATURE OF SUIT:** *(Check One Box Only)*

**A. CONTRACTS**                 **COLLECTION CASES**

| | | |
|---|---|---|
| ☐ 01 Breach of Contract | ☐ 07 Personal Property | ☐ 14 Under $25,000 Pltf. Grants Consent |
| ☐ 02 Breach of Warranty | ☐ 09 Real Property-Real Estate | ☐ 16 Under $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 12 Specific Performance | ☐ 17 OVER $25,000 Pltf. Grants Consent |
| ☐ 15 Special Education Fees | ☒ 13 Employment Discrimination | ☐ 18 OVER $25,000 Consent Denied |
| ☐ 10 Mortgage Foreclosure/Judicial Sale | | |

**B. PROPERTY TORTS**

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | ☐ 06 Traffic Adjudication |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

**C. PERSONAL TORTS**

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 09 Harassment | ☐ 17 Personal Injury- (Not Automobile, Not Malpractice) |
| ☐ 02 Alienation of Affection | ☐ 10 Invasion of Privacy | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 11 Libel and Slander | ☐ 19 Wrongful Eviction |
| ☐ 04 Automobile- Personal Injury | ☐ 12 Malicious Interference | ☐ 20 Friendly Suit |
| ☐ 05 Deceit (Misrepresentation) | ☐ 13 Malicious Prosecution | ☐ 21 Asbestos |
| ☐ 06 False Accusation | ☐ 14 Malpractice Legal | ☐ 22 Toxic/Mass Torts |
| ☐ 07 False Arrest | ☐ 15 Malpractice Medical (including Wrongful Death) | ☐ 23 Tobacco |
| ☐ 08 Fraud | ☐ 16 Negligence- (Not Automobile, Not Malpractice) | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE ☐ IF USED

CV-496/Oct 14

# Information Sheet, Continued

**C. OTHERS**

- [ ] 01 Accounting
- [ ] 02 Att. Before Judgment
- [ ] 04 Condemnation (Emin. Domain)
- [ ] 05 Ejectment
- [ ] 07 Insurance/Subrogation
  Under $25,000 Pltf.
  Grants Consent
- [ ] 08 Quiet Title
- [ ] 09 Special Writ/Warrants
  (DC Code § 11-941)

- [ ] 10 T.R.O./ Injunction
- [ ] 11 Writ of Replevin
- [ ] 12 Enforce Mechanics Lien
- [ ] 16 Declaratory Judgment
- [ ] 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- [ ] 18 Product Liability
- [ ] 24 Application to Confirm, Modify,
  Vacate Arbitration Award
  (DC Code § 16-4401)

- [ ] 25 Liens: Tax/Water Consent Granted
- [ ] 26 Insurance/ Subrogation
  Under $25,000 Consent Denied
- [ ] 27 Insurance/ Subrogation
  Over $25,000 Pltf. Grants Consent
- [ ] 28 Motion to Confirm Arbitration
  Award (Collection Cases Only)
- [ ] 29 Merit Personnel Act (OHR)
- [ ] 30 Liens: Tax/ Water Consent Denied
- [ ] 31 Housing Code Regulations
- [ ] 32 Qui Tam
- [ ] 33 Whistleblower
- [ ] 34 Insurance/Subrogation
  Over $25,000 Consent Denied

**II.**

- [ ] 03 Change of Name
- [ ] 06 Foreign Judgment
- [ ] 13 Correction of Birth Certificate
- [ ] 14 Correction of Marriage
  Certificate

- [ ] 15 Libel of Information
- [ ] 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-1519 (a)]
- [ ] 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- [ ] 21 Petition for Subpoena
  [Rule 28-I (b)]
- [ ] 22 Release Mechanics Lien
- [ ] 23 Rule 27(a) (1)
  (Perpetuate Testimony)
- [ ] 24 Petition for Structured Settlement
- [ ] 25 Petition for Liquidation

/S/ Leizer Goldsmith

July 2, 2015

Attorney's Signature

Date



IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| **LAWANDA BRITT** | |
| and | |
| **MICHELLE RUSH**<br>14613 Carona Drive<br>Silver Spring, Md. 20905, | Case No: 004967 B<br>Calendar 7<br>Judge Clark<br>Scheduling Conference: 10/16/2015 |
| Plaintiffs,<br>v. | **JURY TRIAL DEMANDED** |
| **FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION,**<br>3900 Wisconsin Ave NW,<br>Washington, DC 20016, | |
| Defendant. | |

## FIRST AMENDED COMPLAINT

### I.   JURISDICTION

1.    Plaintiffs LaWanda Britt and Michelle Rush are female residents of Maryland.

2.    At all times relevant to this action, they were employed by Defendant Federal National Mortgage Association ("Fannie Mae").

3.    Britt's employment at Fannie Mae was entirely within the District of Columbia at all times, and Rush also worked in Washington, D.C.

4.    This Court has subject matter jurisdiction over all claims under District and Federal law stated herein.

5.    This Court is the proper venue for these claims.

## II.    EXHAUSTION OF REMEDIES & TOLLING

6.    Britt filed a charge with the EEOC on November 2, 2012.

7.    Britt amended her charge on January 11, 2013, to add that she believed she had been discriminated against based on her Religion, that she had been denied a reasonable accommodation for Ramadan, and that her attendance had been monitored strictly by Wilson.

8.    On information and belief, this EEOC charge was cross filed with the D.C. Office of Human Rights.

9.    Britt therefore exhausted her administrative remedies under Title VII and the D.C. HRA.

10.    The EEOC issued a notice of right to sue on December 9, 2013.

11.    Britt sought arbitration at JAMS pursuant to the arbitration agreement between the parties on March 6, 2014; i.e., within 87 days of the issuance of the right to sue letter from the EEOC.

12.    Accordingly, she has exhausted her administrative remedies pursuant to Title VII and the DCHRA.

13.    No particular administrative remedies need be exhausted under Section 1981.

14.    Under the arbitration agreement, the Plaintiff has 30 days from the date of the final award to reject the award.

15.    The final award from the JAMS arbitrator was issued on May 5, 2015.

16.    Plaintiff rejected that award on May 18, 2015.

17.    Under the arbitration agreement, Defendant agrees to toll the statute of limitations for 60 days after a final award that has been rejected.

18.    Plaintiff brings these claims within 60 days of the May 5, 2015 rejected award.

19.    Accordingly, the claims presented here are timely under the tolling agreement between the parties.

20.    Ms. Rush filed a charge with the EEOC.

21.    On information and belief, this EEOC charge was cross filed with the D.C. Office of Human Rights.

22.    Rush therefore exhausted her administrative remedies under Title VII and the D.C. HRA.

23.    The EEOC issued a notice of right to sue.

24.    Rush sought arbitration at JAMS pursuant to the mandatory, non-binding arbitration agreement between the parties within less than 90 days after the issuance of the right to sue letter from the EEOC.

25.    Accordingly, she has exhausted her administrative remedies pursuant to Title VII and the DCHRA.

26.    No particular administrative remedies need be exhausted under Section 1981.

27.    Under the arbitration agreement, the Plaintiff has 30 days from the date of the final award to reject the award.

28.    Rush rejected that award.

29.    Under the arbitration agreement, Defendant agrees to toll the statute of limitations for 60 days after a final award that has been rejected.

30.    Plaintiff Rush brings these claims within less than 60 days after the rejected award.

31.    Accordingly, Rush's claims presented here are timely under the tolling agreement between the parties.

### III.     FACTS

#### A.     Background

32.     LaWanda Britt (African-American, Muslim) entered on duty for Fannie Mae in around 2005, working in the Records Management field.

33.     In 2008 or 2009, Michelle Rush (African-American) became Britt's supervisor.

34.     In 2011, Jaci Myers (White, non-Muslim) took over the Records Management business unit as the director and then managing director.

35.     Myers hired Erica Wilson (African-American, non-Muslim) as director and Sonia Trask (African-American, non-Muslim), who then became Britt's second-line and first-line supervisors, respectively.

36.     Sonia Trask managed the offsite storage program in the latter half of 2011 and in 2012.

#### B.     Facts Pertaining Primarily to Ms. Britt

**Trask Behaves Offensively Toward Britt**

37.     Trask repeatedly stomped around the office, sat on Britt's desk in a demeaning manner, screamed at Britt, and belittled Britt.

38.     Trask also told Britt that "people in England -- if [you] w[ere] in England, . . . [you] would be considered privileged and people of [Trasks's] skin tone were treated differently."

39.     Britt had no idea why Trask spoke to her about her skin tone and the way people treated her.

40.     Britt believed that she was being subject to reverse discrimination by Trask, who was now in a position of power over someone with lighter skin.

41.     As described by Rush, Trask was "very in [Britt's] face a lot", "hovering over her" and, "there was a lot of close physical contact in LaWanda's cubicle that [Rush] observed on several occasions."

42.     Britt felt "overwhelmed" and that this was "horrific."

43.     The way that Trask had been treating her made Britt feel like "[she] was [Trask's] slave[,]" that "she owned [Britt] basically" and that Britt was "her property" because "sitting on the desk doing whatever she wanted to [Britt] didn't matter to her."

44.     Trask did this at least "weekly" if not "constantly."

45.     Trask never took similar intimidating actions against anyone else.

46.     There appeared to be no reason for Trask to do this, as there was a guest chair available.

47.     Libbie Rozofsky, a co-worker in the same area as Britt, described Trask's conduct as "loud and crazy" and as creating a "hubalabub," and "kind of crazy."

48.     Rozofsky believes Trasks's past conduct toward Britt to be "extremely inappropriate" and confessed that if someone had treated her that way, Rozofsky "would have been horrified."

49.     Rozofsky feels that "[y]ou do not treat another person that way, especially one that you managed" and that Trask's conduct was "a human violation."

50.     Rozofsky told Britt that she should "[g]o and report it" to FM Ethics.

51.     Trask's behavior towards Britt was so demeaning that Rozofsky herself reported Trask anonymously to FM Ethics, Fannie Mae's in-house ethics unit.

**Britt Protests Trask's Behavior**

52.     Britt herself reported Trask's behavior to FM Ethics in January 2012.

53.     Britt also reported Trask's behavior to others, including her management.

    a.     **Britt Protests to Wilson, Myers, Ramsey, Kraft**

54.     Britt protested Trask's conduct, telling Wilson "how [she] was feeling in reference to the way Sonia had been treating [her]. [That she] was being discriminated against . . . [and] how Sonia talked about [her] color . . . sitting on [her] desk."

55.     Britt used the terms "discrimination" and "harassment" with Wilson.

56.     Wilson admits that Britt protested Trask's treatment to her.

57.     Britt also reported Trask's behavior to Myers on several occasions.

58.     Britt informed Myers of Trask's discussion of her skin tone and informed Myers that she felt that Trask was discriminating against her.

59.     Britt stated to Myers that Trask "referenced people of a lighter skin in England were more privileged than people of darker skin and how I thought that was very discriminatory towards me.  As though I was being discriminated against."

60.     Myers walked out of the meeting when Britt stated this, claiming that she had to go to another meeting.

61.     Britt reported Trask's conduct to Gary Ramsey in FM Ethics, stating that she felt that it was reverse discrimination by Trask and that she was being tortured and harassed.

62.     Britt reported to Wilson that she felt that she was being discriminated against by Trask.

63.     Britt spoke with Mike Kraft of FM Ethics and informed Kraft that she felt that she was facing "reverse discrimination, I was being harassed, discriminated against, tortured" by Sonia Trask.

64. Kraft admits that he had a discussion with Britt concerning Britt's interactions with Trask.

65. Despite these reports, Fannie Mae took no action against Sonia Trask.

**Myers Assigns Britt Responsibility for "Dashboards"**

66. In early 2012, Myers assigned to Britt the task of creating a management dashboard.

67. This management dashboard was intended to collect and to summarize data about offsite storage.

68. At the outset, Britt was enthusiastic about producing a dashboard.

69. Britt had never taken a class or been trained in management reporting.

70. Britt produced drafts of this dashboard for review by her supervisors.

**The February 28 Meeting**

71. On February 28, 2012, Myers held a meeting with the Records Management team including Britt.

72. During this meeting, Myers was angry and emotional.

73. Myers used the word "shit" multiple times during this meeting.

74. Employees present at the meeting felt that Myers's comments were directed at particular members of the Records Management team.

75. Wilson, who was present in this meeting, later failed to disclose to Investigations that she heard Myers use the word "shit" during this meeting.

**Britt Protests Myers' Behavior, and Described Myers' Conduct as Treating her Like a "Slave"**

76.     Britt met with Megan Gaither (FM HR) and Michelle McCarthy (White, FM Investigations) after the February 28 meeting.

77.     Britt described to McCarthy and Gaither that she felt that she was being discriminated against and that she felt that she was being treated like "Kunta Kinte" and a "slave."

78.     Fannie Mae took no action to end Trask's treatment of Britt

79.     Britt spoke with Jennifer Collins (FM Ethics) in June 2012 and informed her that Trask's behavior was continuing.

80.     Collins forwarded this information to FM Investigations.

81.     FM Investigations did nothing about this.

82.     In April 2012, FM Ethics produced a report about the complaints about Trask and Myers together.

83.     This report was provided to Human Resources and Myers's direct manager.

84.     On information and belief, Myers was aware that Britt had complained of discrimination against Myers and Trask.

**Myers Refuses Britt's Dashboard Drafts**

85.     After this time, Myers did not provide Britt any feedback on her Management Dashboard drafts that she saw.

86.     Myers rejected all of the drafts she received because she alleged they were not what she wanted in the draft.

87.     Myers never stated or provided notes to Britt concerning what Britt could do to improve the dashboards.

88.     Wilson never asked Myers what she wanted to see in the dashboard.

89.   Britt also reached out to a vendor to produce a dashboard, but Myers and Wilson denied Britt this assistance.

90.   Wilson came to Britt at some point prior to Britt's Midyear review on July 20, 2012, and informed Britt that "this is not what Jaci wanted" and reassigned Britt from the project.

91.   Lisa Summers, who was Myers's supervisee, regularly received feedback as part of drafting documents for Myers.

92.   Other employees regularly received feedback.

93.   Myers marked Britt's dashboard project as incomplete in the team's weekly status updates.

94.   Myers threatened to inform higher management that Britt was not completing her project.

95.   On information and belief, Myers set Britt up to fail this project to justify her later termination.

**Britt Repeatedly Protests Wilson's Failure to Provide Ramadan Accommodations**

96.   Ramadan is the holy month for Muslims.

97.   Ramadan requires adherents to fast during daylight hours.

98.   Ramadan is also an important time to be with family.

99.   In 2012, Ramadan started July 19, 2012, and lasted through August.

100.   In June 2012, Britt sought changes to her daily work schedule as an accommodation for Ramadan.

101.    Britt requested that her hours be changed from 9:30 to 6:00 to the hours of 7:30 to 4:00 so that she could be at home for the Maghrib prayer, the final prayer before the end of fasting.

102.    Britt made this request to Erica Wilson and others in her management chain.

103.    Britt was directed to make this request also to Marian Stevens in Fannie Mae's HR Department.

104.    On July 12, 2012, Stevens emailed Britt and asserted that "to date, you have not provided me with any information that your request for accommodation (earlier hours) is based on your sincerely held religious belief as opposed to a convenience for yourself."

105.    Stevens did not inform Britt that her request for Ramadan accommodations was denied.

106.    Wilson never informed Britt that Stevens's email represented the final word of Fannie Mae on her request for accommodations for Ramadan.

107.    Britt believed that Wilson had the final say in whether she would receive accommodations.

**Britt Requests Ramadan Accommodation at 7/18 Meeting**

108.    On July 18, 2012, Britt met with Wilson to discuss her request for an accommodation.

109.    Wilson told Britt that: "Lawanda, your inability to work independently, I cannot accommodate your request to change your hours for Ramadan."

110.    Britt informed Wilson that she would work 8:30–5, Fannie Mae's core hours.

111.    Wilson had never before stated that Britt was unable to complete her tasks independently.

112.     Britt in fact completed her tasks independently every day and had done so since she was hired by Fannie Mae.

113.     Wilson informed Britt that she would be monitored by Wilson, stating that Britt would have to check in during the morning and in the evening.

114.     After the meeting, Wilson emailed Britt concerning the meeting.

115.     The email from Wilson stated that Britt's request to modify her hours was approved under the conditions that Britt "send an email notification in the morning when you arrive to the office, at the end of the day, and if you are away from your desk for a significant period of time."

116.     Britt responded the same day to Wilson's email by objecting to Wilson's requirement of checking in with her during the day, stating that her coming to work on time had never been an issue.

117.     On the following day, July 19, 2012, Wilson responded that "since your request to modify your work hours due to a religious accommodation was denied by Human Resources I agreed to alter your hours to 8:30-5 going forward.  Given your inability to independently complete project tasks (i.e. Out on Reference, Offsite Storage Dashboard, etc.) this is one of the conditions I am requiring."

118.     Wilson was aware that there was no aspect of Britt's assigned duties concerning Out on Reference or the Offsite Storage Dashboard that Britt could not independently complete.

119.     Britt was not working on Offsite Storage Dashboards at that time.

120.     Britt's performance was rated as "on track" and "on course" in all categories and overall just two days later on July 20, 2012.

121.     No other employee was required to check in in the morning, when leaving his desk for a significant period of time, or at the end of the day.

122.     Wilson's allegation that Britt was unable to complete her project tasks was unfounded and a pretext for denying Britt her accommodation.

### On July 19, 2012, Britt and Trask Discuss the Failure to Accommodate

123.     On July 19, 2012, Britt discussed with Trask Wilson's failure to accommodate Britt's request for a change in her work hours for Ramadan.

124.     Trask secretly took notes on this conversation and forwarded the conversation to Wilson and Myers.

125.     In this email, Trask provides notes stating: "[Britt states she] cannot go through Ramadan with this unfair treatment and issues. It was not fair she was unable to change her hours due to Ramadan and unfair about being told she cannot work independently - Erica told her this on 7/18 and she was not feeling well at the time and she is not feeling well now."

126.     Trask sent an email with her notes on her discussion with Britt to Myers, Wilson, and Gaither.

127.     Wilson and Myers received this emailed document and read it.

### Britt Emails Collins

128.     Britt emailed Collins in Investigations and informed her that her Ramadan accommodations had been denied.

129.     Collins forwarded this information to Investigations.

130.     Collins did not pursue the matter further because Investigations had the same information already.

131.     Fannie Mae lost Collins's email concerning this discussion.

Britt Receives Favorable Performance Review on July 20, 2012.

132.    On July 20, 2012, Britt met with Wilson and Gaither to discuss Britt's midyear performance review.

133.    As part of that review, Wilson provided Britt with a paper copy of her midyear review.

134.    Britt's midyear review indicated that she was "on track" or "on course" to meet all of her performance objectives and behaviors by the end of the year.

135.    During the mid-year review meeting, Britt presented Wilson with a memorandum.

136.    Rush had provided Britt assistance in writing this memorandum (see further discussion below), crafting the words that Britt stated.

137.    In this memorandum, Britt asserted that Wilson had falsely stated that she was unable to work independently and that Wilson had set her up to fail.

138.    This memorandum contradicted the asserted bases that Wilson provided were the reasons Wilson denied Britt her requested change in hours for Ramadan.

139.    Wilson discussed this memo with Gaither, who also received a copy during the mid-year meeting.

140.    Wilson discussed this memo with Myers, who read the memorandum after Britt's mid-year meeting.

141.    Wilson did not believe that Britt had written this document on her own.

142.    Wilson believed that the only other person who could have assisted Britt in writing this memo was Rush.

143.    After receiving this memo, Wilson called Britt and Rush to confirm that Rush was assisting Britt in writing a separate document, stating to both "I know [Rush's] writing."

-14-

144.   Within three weeks, by August 7, 2012, Wilson had determined to terminate Rush.

**Wilson Gives Britt an "Individual Development Plan"**

145.   Fannie Mae's "Human Resources Policy and Practice handbook" includes a section called "Performance Improvement."

146.   In this section, this handbook states "Mangers are strongly urged . . . to notify an employee of any concerns, and to take appropriate steps to address performance deficiencies as soon as they are detected."

147.   The handbook also states in this section "Employees have optimal opportunity to improve if they are made aware of the specific problems with their performance and given suggested steps to improve."

148.   Fannie Mae's handbook also states that a manager can aid the process by being "proactive," listing: "Identify the area(s) of deficiency and work with the employee to identify any possible causes of the problem[;] . . . develop a plan to improve performance[; and] allow the employee a reasonable opportunity to improve before taking additional disciplinary action[.]"

149.   Wilson provided Britt with a document termed "Individual Development Plan" around the time of Britt's midyear review.

150.   Wilson admits that this individual development plan is not a performance improvement plan.

151.   Wilson did not provide Britt with any other feedback about her performance after providing her with the individual development plan around July 2012.

152.    Wilson did not provide Britt with any steps to take to improve her performance after providing her with the individual development plan around July 2012.

153.    Wilson claims that she provided this individual development plan because Britt had "deficiencies that she needed to work on to continue being successful."

154.    Fannie Mae's policy recommends that managers: "Provide specific examples of the unsatisfactory performance."

155.    The IDP contains no examples of past or present unsatisfactory performance and the term "unsatisfactory" or any synonym is not contained within the individual development plan Wilson gave to Britt.

156.    This development plan included no written instructions in the "action plan" and Wilson did not work with Britt to develop such a plan.

157.    This development plan asks Britt to draft 2–3 dashboard management reports concerning off-site storage.

158.    Britt was no longer working on dashboard management reports concerning offsite storage at the time the IDP was provided to her.

### Wilson Discusses Terminating Britt and Rush with Myers

159.    Wilson's August 7, 2012 notes reflect that she, Myers, and Gaither (HR) discussed Britt and Rush, noting as to Rush: "termination based on attendance . . . consider terminating MR first then Britt to identify potential additional performance concerns. . . . Draft documents by Friday."

160.    Wilson's August 7 notes also list next to LaWanda Britt's name "- Midyear on track[,] things Sonia discovered[;] –Megan to forward template[;] . . . –lack of controls[;] –code of conduct violation."

161.    Rush, the only other employee whose name appears on these notes, was marked as "off track" in her mid-year (although she received on-track and on-course for all of her performance and behavior measurements); but Britt was marked as "on track."

162.    These notes indicate that these individuals sought to manufacture reasons for terminating Britt and even to delay Britt's termination to make them appear to be unconnected.

163.    On information and belief, these notes indicate that Wilson, Myers, and Gaither discussed terminated Britt within three weeks of her protests concerning Ramadan and the reasons she was not accommodated.

164.    Wilson's notes on August 8, 2012, state "Review MR termination letter[;] - letter not strong enough, will provide additional guidance[.]"

165.    On Thursday August 9, 2012, Wilson sent an email to Myers and Gaither entitled "CONFIDENTIAL – HIGHLY RESTRICTED: Justification Termination" with the attachment "MR Justification Termination Template.doc" with the body text:  "Please see the attached for MR.  We can discuss further.  The one for LB is forthcoming by end of business today."

166.    Wilson and Myers both claim that they do not now know what the meaning of "the one" in the context of this email is.

167.    Neither the handwritten notes nor the email from Wilson described above were produced during discovery in the arbitration for Britt.

168.    Under the JAMS arbitration rules applicable to Britt's arbitration case, "all Parties continue to be obligated [during the arbitration] to provide relevant, nonprivileged document . . . ."

169.    Attached to Wilson's August 9 email was a two-page memorandum justifying the termination of Michelle Rush based on tardiness.

170.    The only way for Wilson to know whether Rush had been tardy was to have a "badge report" obtained from the security office.

171.    Wilson did not receive a badge report between July 13, 2012, and August 10, 2012.

172.    Myers denies that she and Wilson discussed terminating Rush at that time on or before July 13, 2012.

173.    Wilson does not now recall when she first determined to terminate LaWanda Britt after July 20, 2012.

174.    The first time Wilson and Myers discussed terminating Rush is after Wilson received Britt's July 20, 2012 memorandum.

175.    Wilson fired Rush on August 28, 2012, allegedly because Rush was unable to get to work on time.

**Wilson Fires Britt**

176.    On October 4, 2012, approximately two months after Ms. Rush was fired (see below), Wilson signed the final memorandum "Justification for Termination of LaWanda Britt."

177.    In this memorandum, Wilson provides "examples" of the Britt's alleged performance deficiencies.

178.    Wilson faulted Britt in the termination memo for being unable to produce a management dashboard.

179.    Wilson now admits that Britt was not working on the management dashboard after Britt was provided with her individual development plan.

180.    Wilson faulted Britt in the termination memo for a lack of adequate controls in off-site storage, leading to more than 1000 boxes of documents being lost, not policing access to the off-site storage database, and causing an off-site storage issue to be identified in an audit.

181.    Wilson now denies Britt was the cause of the boxes referred to in the memorandum being lost.

182.    Britt was not responsible for authoring the procedures for off-site storage that would have required policing access better.

183.    Britt did in fact police internal access to the off-site storage database.

184.    Other than asking for Britt to produce "2–3 Summary Dashboard Reports related to Offsite Storage Activities", Wilson's individual development plan did not identify any of these alleged deficiencies in any manner.

185.    On October 23, 2012, Wilson formally fired Britt from Fannie Mae, allegedly because of performance.

C.    **Facts Pertaining Primarily to Ms. Rush**

186.    Michelle Rush held the position of Compliance and Ethics Specialist IV, earning $140,608 plus a 20% bonus per year.

187.    This work routinely took more than forty hours per week, and it is undisputed that Ms. Rush regularly stayed well into the evening to accomplish the work.

188.    Prior to July 20, 2012, Rush was late to work by a few minutes practically every day.

189.    There is no evidence that Rush was on time prior to when Jaci Myers took over the Records Management team in mid-2011 or after that time up until early 2012, when Myers and Wilson began tracking arrival times.

190.   Myers's tirade on February 28, 2012, months after she took over responsibility for the Records Management team, focused in part on employees being timely in getting to work.

191.   Thus it was no secret that Rush was habitually late well prior to the February 28 meeting.

192.   As Wilson put it, her reaction to Rush's repeated tardiness was to warn Rush to "not let this be [Rush's] issue."

193.   Even after the 2/28/12 meeting, Rush continued to arrive late and her management continued its condonation.

194.   After Myers began tracking Rush's arrival times in April 2012, Rush was late 78% percent of the time, as calculated by Fannie Mae.

195.   However, between April 2012 and June 8 2012, Wilson and Myers took no action at all to stop the tardiness.

196.   After the 2/28/12 meeting, Rush informed McCarthy that she felt that she was being treated like a slave.

197.   This statement was then included in the April 11, 2012, memorandum that Nancy Jardini (white) received, which stated that: "[t]wo African-American individuals who attended the meeting stated to Investigations that . . . [Myers] spoke to the group like a 'master speaks slaves' or words to that effect."

198.   Jardini does not deny that Myers may have been given this memorandum.

199.   Myers pulled the badging records for employees starting only in April, 2012.

200.   This was after Britt and Rush had both objected to investigations about Myers's conduct, and just days before investigation into Myers's conduct was completed.

201.   In April, Wilson apparently did not mind if Rush arrived at work after 9:45 AM.

202.    Indeed, she suggested altering Rush's starting time back to 10:00 (as it had previously been set) to accommodate Rush dropping off her children at school.

203.    Wilson brought the issue to Myers's attention, asking "you are okay with this[?]" *Id.*

204.    Wilson's implication was clear: *I am okay with this if you are.*

205.    Wilson, however, now asserts that she was not okay with the later starting time.

206.    Other Fannie Mae employees expressed to Rush that being on time was not important.

207.    Thus, HR's Megan Gaither told Rush that she was allowed to be late and that every employee had a 15-minute grace period.

208.    This was consistent with the meeting handout that Myers provided to Gaither in advance of the February 28, 2012 meeting, but was not actually handed out during that meeting. Ex. 160.

209.    Gaither acknowledged that she received the document, which states in its first full sentence that "You must arrive no later than 15 minutes passed [*sic*] your stated arrival time[.]"

210.    Gaither could not recall when she received an amended version of the handout and almost certainly believed that this version was the final version that Myers disseminated.

211.    This was why she told Rush about a 15-minute grace period.

212.    At the arbitration hearing, Gaither testified that this handout did not conform to Fannie Mae policy, indicating that she read the document and understood its contents, and that it would have been one of the first things that she read.

213.    Gaither also could not state when she believed that she received a corrected version of the handout.

214.    Gaither provided Rush with what she believed to be correct information – the handout– and when confronted with this mistake, simply denied that she had given that information to Rush and tried to keep Rush from retelling what Gaither had originally said to her.

215.    Even taking Myers at her word, it appears she was also not concerned about Rush or any other member of the team being late – she wanted to provide them with a 15-minute grace period and only changed this statement at the insistence of Gaither.

216.    It was not until June 8, 2012, that Wilson confronted Rush about her routine tardiness at a meeting. Wilson later sent Rush an email with an attendance policy attached.

### Wilson Allows Rush Scheduling Flexibility for Summer Camp

217.    Wilson testifies that, during the summer months, she allowed Rush flexibility to be late because Rush needed to drop her children off at camp.

218.    Rush and Wilson discussed that Rush dropping the children off at camp would cause her to be late, and Wilson responded by granting her that flexibility.

219.    Wilson forwarded Rush's message to Myers, which stated: "First day of camp. Had to meet both counselors and get them settled.  Will be in the office by 10:15[.]"

220.    Myers responded to Wilson: "I assume she did not give you any notice of this in advance."

221.    Wilson did not respond to Myers.

222.    Wilson was apparently too scared of a Myers 'cursing tirade' to tell Myers that Wilson had approved Rush's late arrivals for the entire summer.

**Myers and Wilson Meet on July 10, 2012; Wilson Meets With Rush on July 13, 2012 About a "Memorandum of Concern"**

223.     Myers and Wilson met on July 10, 2012, and discussed Rush, but had no intent to fire Rush at that time.

224.     Wilson took notes during that July 10, 2012 meeting with Myers, just three days prior to the July 13, 2012 meeting with Rush about the memorandum of concern.  The meeting notes state: "proceed w/ MOC if late even 1x results in termination."

225.     These aren't Wilson's words; at hearing Wilson testified that they were Myers's instructions to her.

226.     Myers, for her part, admitted that there was never any discussion of firing Rush around the July 10 meeting.  Wilson testified that she could not explain what her notes on Myers's statements to her actually meant

227.     Wilson also made a note reflecting that Myers said on July 10, 2012, "Michelle Rush . . . off Track . . . proceed w/ MOC if late even 1x results in termination."

228.     This is apparently shorthand, that, according to Wilson, referred to what Myers said to her.

229.     The terms that Myers used and that Wilson wrote down were without punctuation.

230.     The notation is an unreliable statement of what Myers thought, not what Wilson thought.

231.     There is no basis for reading this to indicate that Wilson intended to terminate Rush if she were late even one more time.

232.     As testified to during the hearing, Wilson went through at least one round of drafting the MOC before providing it to Rush.

233.    The early drafts on July 10 included language informing Rush that she was expected to arrive at 9:45 or to notify Wilson, and in the July 13 version this language was highlighted.  Unchanged on July 13 was the language threatening further action "up to and including termination."

234.    Wilson did not inform Rush that she would be fired if she were late one more time.

235.    Even when Rush asked her point blank if this were true, Wilson denied it.

236.    The inescapable conclusion is that Wilson had no intention of firing Rush for being late one more time.

### Rush Receives Praiseworthy Performance Review

237.    Rush's performance review shows that Fannie Mae and Wilson remained unconcerned with Rush's lateness even as of July 18, 2012, when Wilson provided Rush with her performance review which was all positive except for the overall trend.

238.    Wilson's draft of the midyear review shows that she in fact took Rush's performance goal for category 1.6 — implementing at least one proposal — originally marked as "not on course[,]" up to "on course" on the copy in Fannie Mae's system.

239.    These goals were comprehensive, covering numerous aspects of Rush's performance, including that Rush was "on course" with "consistently deliver[ing] on or before the stated deliverable date / deadline."

240.    Indeed, the harshest criticism in the only version of Rush's July 2012 midyear evaluation untainted by post-hoc revisions does not include any typed language concerning Rush being late, and instead it admonishes Rush of the "need to ensure on time" and to "stop making excuses."

-24-

241.    Nothing indicates that at the time of Rush's midyear review, Rush was threatened with termination or anything of the sort. As Rush testified, both Wilson and Gaither disclaimed that Rush's job was in jeopardy if she were late one more time.

242.    Wilson admits that she did not seek to warn Rush that if Rush continued to be late, she was going to be subject to termination.

243.    Wilson told Rush at her midyear review that she wanted Rush to fill in for her during her planned maternity leave.

244.    In the memorandum of concern, Wilson did not state or imply that Rush would be fired if she were late again, and Wilson also denied this intent to Rush's face.

245.    Wilson did not warn Rush that if Rush were late one more time, Rush would be terminated — because that was not Wilson's intent at the time of the midyear review.

246.    Things changed when Rush drafted the 7/20 memo for Britt, objecting to Wilson's conduct, arguably betraying Wilson's kindnesses toward Rush and directing Britt's allegations for the first time directly at Wilson.

247.    Thereafter, Wilson moved immediately against Rush.

248.    Wilson knew and believed that Rush was a valuable employee. Accordingly, for Rush's midyear evaluation, she rated Rush across the board as positive "on track" and "meets expectation," except for the mid-year trend, which was marked as off-track.

249.    Wilson apparently simply wanted Rush to improve her timeliness, but wrote that Rush was otherwise a fine if not outstanding employee.

250.    Wilson also knew that Rush was a key employee.

251.    Wilson in fact wanted to support Rush and to keep her on as a valued employee at the time of Rush's midyear evaluation on July 18, 2012.

252.    By July 20, 2012, Rush could have been fired multiple times over for tardiness, if Defendant really cared about that issue.

253.    Defendant's attendance policy, which states that six instances of late arrival in a year constitutes "excessive[] tard[iness]" and therefore a basis for termination.

254.    Defendant offers no credible explanation for not firing Rush for her lateness prior to July 20, 2012, just after Rush supported Britt in Britt's protest regarding Ramadan.

**Rush's Memo on Behalf of Britt in June and July 2012**

255.    Britt's attempts to get her hours changed for Ramadan started in June 2012, when she informed Wilson outside of a bathroom that she wanted to change her hours for Ramadan.

256.    Britt also took this request to others at Fannie Mae, seeking a change in her hours to be at home for breaking the day-long fast in the evening.

257.    Britt first communicated with Marian Stevens, who told Britt that it appeared that her request to be at home was not "based on a sincerely held religious belief" and that it was merely "a convenience for [her]self." Britt was told that she could continue her request with her manager, Wilson.

258.    Britt next discussed the issue with her manager on July 18, 2012. At that meeting, Wilson told Britt that she was denying her request for accommodations, for the alleged reason that Britt was not able to "work independently."

259.    Britt told Wilson that she would change her hours to Fannie Mae's core hours 8:30 AM–5:00 PM.

260.    In her follow up email, Wilson confirms that Britt would be allowed to workFannie Mae's core hours, but that a new restriction was being inflicted upon her: that she would be required to check in frequently during the day — morning, noon, and evening.

261.    Britt responded to Wilson's failure to permit the hours she requested in her Ramadan request and the additional monitoring, by questioning the premise of Wilson's reason for monitoring her, stating that her "getting to work on time or working a full day has never been an issue" and that "That suggest[s] a lack of trust."

262.    Wilson responded to Britt's incredulous response to her email by confirming that in response to Britt's request for a religious accommodation, which was denied, Wilson would only allow Britt to work Fannie Mae's "core hours" — the hours that any employee was allowed to work — if Britt met conditions of checking in with Wilson.

263.    Wilson's email brought Britt's Ramadan hours change directly into the picture, stating:

> As I mentioned during our discussion, since our request to modify your work hours due to a religious accommodation was denied by Human Resources I agreed to alter your hours to 8:30-5 going forward. Given your inability to independently complete project tasks (i.e. Out on Reference, Offsite Storage Dashboard, etc.) this is one of the conditions I am requiring. There is not a "lack of trust" rather a performance concern which we have previously discussed. Happy to discuss further. Erica.

264.    Wilson doubled down on denying the Ramadan request by telling Britt that she could work "core hours" only if Britt met these onerous conditions based on the false premise that Britt could not work "independently."

265.    Britt then continued to object to Wilson's characterization of her ability to work independently and the concomitant requirement that she check in with Wilson multiple times per day, just to be allowed to work Fannie Mae's core hours.

266.    On July 19, 2012, Britt protested to Sonia Trask that "she cannot go through Ramadan with this unfair treatment and issues" and "it was not fair she was unable to change her hours due to Ramadan and unfair about being told she cannot work independently."

267.     It is undisputed that Myers and Wilson both received Trask's secret notes from this conversation with Britt, including Britt's protected statements.

268.     Britt went to Rush to help her draft a letter objecting to Wilson's bases for denying her Ramadan request—Out on Reference and Offsite Storage Dashboard.

269.     During her midyear meeting with Wilson on July 20, 2012, Britt continued to object to Wilson's basis for denying her Ramadan hours and requiring her to check in multiple times per day.

270.     Britt continued the discussion with Wilson about the reasons for Wilson denying her accommodation request.  Wilson informed Britt that she was being rated as "on course" and "on track" for her work on behalf of Fannie Mae.

271.     Nevertheless, seeing that Wilson still did not admit that the reasons for denying her Ramadan request were baseless, while still in the meeting, Britt handed Wilson a copy of the memorandum that Rush had written on Britt's behalf.

272.     Rush's memo objected in the opening paragraph directly to Wilson's bases for denying her Ramadan requests, stating: "I am especially concerned because of recent feedback from you stating my inability to work independently and failure to complete deliverables, specifically the Offsite Storage metrics dashboard and the Out on Reference project."

273.     Rush's memo for Britt also makes clear that "now I am being told that I cannot work independently when performing data analysis and producing a metrics dashboard . . . ." It continues "I feel as though I was set up to fail . . . . I work independently each and every day to perform the tasks mentioned above with no guidance from my manager."

274.     Rush's letter continues: "it is shocking to me that this dashboard is being held solely over my head, to the point where I am now expected to e-mail you each day upon my arrival and departure.  This is completely unfair and unjust treatment."

-28-

275.    Rush's memo on Britt's behalf concludes: "In summary, I have always been consistent with getting to work on time and working far more than 7.5 hours in a day. The notion that I am expected to 'report in', despite the fact that I work independently on most of my tasks and responsibilities, is just unfair. I feel that you and my manager, based on my employee level and experience, set unfair expectations of me and did not provide the support, training or guidance needed to complete the two tasks that I am solely being held accountable for."

276.    When Britt handed Rush's memo to Wilson, Wilson became enraged, her voice going up. She repeated the words from Rush's memo: "set you up?"

On July 20, 2012 and its Aftermath, the Retaliation Proceeds

277.    After Britt personally handed Wilson and Gaither the memorandum Rush had drafted on her behalf objecting to the reasons for Wilson's failure to provide Ramadan accommodations, Wilson immediately set in motion the machinery that would result in Rush's (and Britt's) termination.

278.    Wilson's demeanor towards Rush changed, and Wilson became cold to her.

279.    Immediately, Wilson called Rush and Britt and confirmed that Rush and Britt were working together and that Rush was assisting Britt in writing.

280.    This occurred the very next day after Britt handed Wilson the memo.

281.    On July 25, 2012, Wilson changed Rush's midyear review to reflect the reason that Wilson eventually gave for firing Rush.

282.    Thus, instead of Wilson's handwritten notes made on the same day as Rush's midyear review, stating "stop making excuses" for being late, Wilson manufactured evidence that Rush was fully warned beforehand that she was going to be fired if she were late by

inserting language into Rush's midyear: "Michelle's assessment at mid-year is "off track" due to excessive late arrivals over a three month period.  A memorandum of concern was issued as a warning and notice that continued late arrival is unacceptable."

283.    Wilson also added Gaither's language that "prior to the MOC, Michelle received ongoing feedback and a verbal warning regarding her ongoing pattern of tardiness."

284.    This language then appeared in the unsigned version of Rush's midyear review.

285.    For the arbitration hearing, Defendant could not produce Rush's actual mid-year review.

286.    No document that had been signed or dated for the midyear review in 2012 has been produced or put forward in this litigation.

287.    Every single prior review from Rush was either signed or dated indicating that the employee had received it.

288.    Rush testified that she was required to mark the document as having been received.

289.    Britt's own midyear review reflected that she had acknowledged it and that this was recorded in the electronic system.

290.    Defendant has generated two versions of the midyear evaluation for Rush that were unsigned, one printed in December 2013 (more than one year after Rush was fired), and one printed apparently prior to Rush's midyear review on July 18, 2012.

### Wilson and Myers Discuss Terminating Rush & Britt

291.    No evidence indicates that Wilson did not discuss terminating Britt and Rush, immediately after Wilson received Rush's objection memo drafted on behalf of Britt.

292.    By not later than August 7, 2012, just two weeks after Britt handed Wilson the memo Rush drafted on her behalf, objecting to her treatment and the reasons for being denied Ramadan accommodations, Wilson's notes indicate that she determined to "terminate [Rush] based on attendance."

293.    Tellingly, Wilson then writes: "consider terminating [Rush] first then [Britt] to identify potential additional performance concerns.

294.    At the bottom she stated "Draft documents by Friday." She also lists a number of possible bases for terminating Britt on the left-hand side of the notes, indicating that Wilson was searching for any reason to terminate Britt—including gems such as "code of conduct violation"; "things since discovered" after her successful midyear review; and "lack of controls."

295.    The sequence of the firings was by then already set: first Rush, then Britt.

296.    On August 9, 2012, Wilson apparently drafted the termination memos for Rush and Britt. The conclusion is inescapable from the text of the email:

> Subject: CONFIDENTIAL – HIGHLY RESTRICTED: Justification Termination
> Attachments: MR Justification Termination Template.doc
> Importance: High
>
> Please see attached for MR. We can discuss further. The one for Britt is forthcoming by end of business today.

297.    Myers, Wilson, and Gaither all knew of this email.

298.    The email was not produced during Britt's arbitration.

299.    This greatly aided Defendant in arbitration, and revealed its willingness to go to great lengths cover up its true motivations.

300.     Myers and Wilson have both testified under oath that they cannot remember what "the one" means in the context of this email – i.e., they knew at one time but today cannot recall.

301.     Myers and particularly Wilson appeared to have a willful lack of recollection.

302.     Wilson could recall her notes from July 10, 2012, and indeed what the context was in which she wrote them, but is unable remember anything having to do with Britt and her termination.

303.     Only on August 10, 2012, after Wilson had already determined to terminate Rush and Britt, did Wilson pull a badge report for Rush.

304.     This was the only way for Wilson to confirm that Rush was in fact late to work.

305.     In fact, on August 13, 2013, the date of the final version of Wilson's termination memo, Ex. 18, Wilson asked Gaither to check in on Rush's arrival time, stating "I think Michelle may have been late today.  Can we run another report . . . ?"

306.     Gaither confirmed that Rush was not late; instead "Michelle's arrived [sic] 9:43 am today."

307.     Wilson apparently did not know when Rush was late and when not.

308.     The August 10, 2012, badge report which Wilson received showed that Rush arrived after 9:45 a total of 5 times since July 13, 2013.

309.     These were:  July 25 (9:46), August 3 (10:01), August 7 (9:59), August 8 (9:56), August 10 (9:46).  Id.

310.     According to Wilson and Myers's August 13, 2012, Rush was late a total of "3 occurrences" after July 13.

311.     These were the final justification for Rush's termination and the sole basis that Wilson asserts now that she had for terminating Rush.

312.    However, Wilson did not even have this information on August 9, when she determined to terminate Rush.

313.    In fact, the number of times, or even whether Rush was in fact late, had no bearing on whether Rush was going to be fired — that decision had already been made at that point.

314.    Indeed, Wilson's August 9, 2012 email indicates she was not aware of how many times or even whether Rush had been late since receiving the July 13, 2012 memorandum of concern.  That document includes no examples or number of occurrences: "Since that time [July 13], Michelle has arrived late on xx occurrences (as noted below): Examples: (see Megan to confirm.)

315.    Fannie Mae did not include the excuse of recent lates as justification for Rush's termination in their response to the Office of Human Rights.

316.    Fannie Mae instead concentrated on the number of times Rush was late since April 2012 until her termination.

317.    The August 10, 2012 badge report was in fact the last report that Wilson received until August 24, by which time she had already determined to fire Rush.

318.    Wilson did not have the basic facts she needed to conclude that Rush had been late at all.

319.    Wilson could not have concluded that Rush was late prior to August 10, 2012, on any particular date and her drafts are devoid of any examples on August 9 and 10.

320.    On August 24, 2012, Gaither claims to have informed the security office of Rush's imminent termination and then received in response the raw data concerning Rush's badging in history.

321.    By that time-- even by Wilson's own admission-- she and Myers had long-since determined to fire Rush.

Badging

322.    No facts support Defendant's alleged reason for firing Rush based on "double-badging."

323.    Myers testified that the only reason she terminated Rush was because she had discovered that Rush was being dishonest by allegedly "double-badging" based upon her cursory review of an email containing "raw data" that she alleges she could read accurately.

324.    At that point, according to Myers, she said "no more chances" and determined that Rush would be fired.

325.    Myers testified that Rush's tardiness to work at that point meant nothing to her -- the decision to terminate was made by Myers based on the "double badging" only.

326.    There is not one contemporaneous document that corroborates that Myers in fact made this determination and instructed Wilson to terminate Rush based on this reason.

327.    Significantly, in its December 2013 letter to the D.C. Office of Human Rights, Fannie Mae mentions nothing of Rush allegedly "double-badging" to fool her supervisors into believing that she was in fact on time.

328.    Defendant still does not assert this as a reason for Rush's termination, despite amending its interrogatory responses in the Rush arbitration to state:

> Fannie Mae states that Erica Wilson made the decision to terminate the Claimant's employment. Ms. Wilson conferred with her Human Resources Business Partner Megan Gaither on her decision. Ms. Wilson notified her supervisor, Jaclyn Myers about her proposed action. Respondent further directs Claimant to its answer/response to the Demand in this case and the Justification for Termination authored by Erica Wilson.

329.    Thus, according to Fannie Mae's interrogatory responses, the decision to terminate Rush was made entirely by Wilson, without Myers' input into the decision.

330.    Myers's story is trying to invent a new reason for terminating Rush that appears not to have come up until years later.

331.    Myers testified that she received an email and discovered for herself that Rush was badging in twice within a few minutes, and determined from that information alone that Rush was being dishonest about her arrival times.

332.    As Rush testified to at the arbitral hearing, there were various reasons that her time records would appear that way in August 2012, but Myers never did a thing to investigate these instances — because she really was not interested.

333.    Myers testified that when she saw the badging records, she recognized this to be an act of dishonesty because Rush made it appear as if she had badged in *on time*.

334.    However, Rush badged in first *after* the 9:45 start time for the four incidents that Myers testified she counted in the records (August 10, 15, 20, and 23).

335.    Myers testified that she was not aware of the locations listed in the document, and thus could not have determined where Rush was badging in and consequently, for what purpose.

336.    Myers also admitted that she did not see any other copies of the raw data for the badge-in reports with which to compare these otherwise inscrutable figures.

337.    Myers did not confer with anyone about the contents of the document or anyone in the security office who could have interpreted the date for her.

338.    The improbable and incredible series of events described by Myers is an admission that the alleged "tardiness" reason for firing Rush was never the real reason for the termination of Rush's employment.

-35-

339.    Myers, Wilson's superior who claims to be the real decision maker, discarded that longstanding excuse completely at the hearing and instead relied solely on the alleged "double badging."

340.    Following Myers' logic, dishonesty was committed by Erica Wilson and Fannie Mae, who do not accurately record that Myers made the decision to terminate Rush, and that this decision was made after August 24, 2012, on account of badging.

341.    Myers refuses to acknowledge that by the time she reviewed the badging documents on August 24, 2012, Rush's firing had long-since been initiated by Wilson.

342.    Wilson claims to have made the Rush firing decision much earlier — perhaps ten days earlier — around August 1.

343.    However, Wilson actually had already written the termination memos for Rush and Britt on August 9, fully two whole weeks before Myers ever looked at the badging documents, and tellingly, just over two weeks after the protected events of July 20.

344.    At deposition, as read back in impeachment at the hearing, Wilson's alleged reason for firing Rush was limited to tardiness.

345.    The only reason for Wilson's switched testimony that badging issues motivated Rush's firing, is to attempt to set forth some apparently legitimate reason after her earlier-alleged alibies were impeached.

## IV.    STATEMENT OF CLAIMS

### Count I:    Religious Discrimination in Employment Termination, in Violation of Title VII and the D.C. Human Rights Act, Inflicted Upon Plaintiff Britt

346.    Plaintiff Britt incorporates by reference all of the above-stated paragraphs as if fully stated herein.

347.    Britt is Muslim.

348. Non-Muslim Fannie Mae managers terminated Britt's employment.

349. Fannie Mae replaced Britt with a non-Muslim.

350. Wilson and Myers were aware of Britt's religion because of her requests for religious accommodations.

351. The reasons asserted for Britt's termination are pretextual and not the real reasons for her termination.

352. Defendant fired Britt because of her religion.

353. Fannie Mae's termination of Britt because of her religion constituted unlawful religious discrimination in violation of Title VII and the DCHRA.

**Count II:** **Retaliation in Employment Termination, in Violation of Title VII, 42 U.S.C. §1981 and the D.C. Human Rights Act. Retaliation under DCHRA, 42 U.S.C. 1981 and Title VII, Inflicted Upon Plaintiff Britt**

354. Plaintiff Britt incorporates by reference all of the above-stated paragraphs as if fully stated herein.

355. Protesting race and color discrimination is a protected activity under DCHRA and Title VII.

356. Protesting harassment based on color is a protected activity under Title VII, 42 U.S.C. §1981 and the DCHRA.

357. Failing to make a reasonable religious accommodation is a violation of Title VII and the DCHRA.

358. Britt engaged in protected activity by reporting Sonia Trask's conduct to her supervisors, FM Ethics, and FM Investigations and describing it as discriminatory.

359. Britt again undertook protected activity by requesting Ramadan accommodations which were denied.

360.    Britt engaged in still more protected activity by challenging Wilson's reasons for denying her request for Ramadan accommodations.

361.    But for Britt's protest against Wilson's failure to provide her with religious accommodations, Wilson would not have terminated Britt's employment.

362.    Indeed, Wilson determined that she would terminate Britt within just three weeks after Britt's protected protests concerning her request for Ramadan accommodations.

363.    The reasons Wilson asserts for terminating Britt are not truthful.

364.    Wilson terminated Britt because Britt engaged in protected activity under Title VII, 42 U.S.C. §1981 and the DCHRA.

365.    Wilson acted as Fannie Mae's agent in terminating Britt.

366.    Fannie Mae's firing of Britt because of Britt's prior protected activity constitutes unlawful retaliation in violation of the DCHRA, 42 U.S.C. 1981 and Title VII.

### Count III:    Unlawful Hostile Working Environment on Account of Color under Title VII and the DCHRA, Inflicted Upon Plaintiff Britt

367.    Plaintiff Britt incorporates by reference all of the above-stated paragraphs as if fully stated herein.

368.    Under the DCHRA, 42 U.S.C. 1981 and Title VII, it is unlawful for an employer to create a hostile working environment based on color.

369.    Trask harassed Britt because of Britt's color.

370.    Trask's actions against Britt constituted a hostile working environment based on her color.

371.    Britt's and Trask's supervisors were made aware of informed that Trask's conduct was creating this hostile working environment, by multiple employees.

372.    Wilson and Myers (along with FM Ethics and Investigations) took no action to correct Trasks's unlawful behavior against Britt.

373.    Fannie Mae created and allowed a hostile working environment based on color, thereby violating Title VII and the DCHRA.

### Count IV:    Failure to Provide Reasonable Religious Accommodations under Title VII and the DCHRA, Inflicted Upon Plaintiff Britt

374.    Plaintiff Britt incorporates by reference all of the above-stated paragraphs as if fully stated herein.

375.    Under Title VII and the DCHRA, Fannie Mae was required to provide employees with reasonable accommodations for their religious practices.

376.    Britt requested a reasonable accommodation to change her hours for Ramadan.

377.    Fannie Mae failed to provide this reasonable accommodation.

378.    Fannie Mae's failure to provide Britt with a reasonable accommodation for Ramadan constituted discrimination under Title VII and the DCHRA.

### Count V:    Retaliation by Employment Termination, in Violation of Title VII, 42 U.S.C. §1981 and the D.C. Human Rights Act. Retaliation under DCHRA, 42 U.S.C. 1981 and Title VII, Inflicted Upon Plaintiff Rush

379.    Plaintiff Rush incorporates by reference all of the above-stated paragraphs as if fully stated herein.

380.    Protesting employment discrimination is a protected activity under DCHRA and Title VII.

381.    Rush engaged in protected activity by opposing Myers' February 2012 conduct, and by supporting Britt's protected opposition to the failure to afford her religious accommodation.

382.     But for Rush's support of Britt's protest against Wilson's failure to provide her with religious accommodations, Defendant would not have terminated Rush's employment.

383.     Indeed, Defendant determined that she would terminate Rush within just three weeks after Rush's support of Britt's protected protests concerning her request for Ramadan accommodations.

384.     The reasons Myers asserts for terminating Rush are not truthful.

385.     Defendant terminated Rush because Rush engaged in protected activity under Title VII, 42 U.S.C. §1981 and the DCHRA.

386.     Myers acted as Fannie Mae's agent in terminating Rush.

387.     Fannie Mae's firing of Rush because of Rush's prior protected activity constitutes unlawful retaliation in violation of the DCHRA, 42 U.S.C. 1981 and Title VII.

**Count VI:**     **Race Discrimination Inflicted Upon Ms. Rush, in Violation of Title VII, 42 U.S.C. §1981 and the D.C. Human Rights Act. Retaliation under DCHRA, 42 U.S.C. 1981 and Title VII**

388.     Plaintiff Rush incorporates by reference all of the above-stated paragraphs as if fully stated herein.

389.     Under the DCHRA, 42 U.S.C. 1981 and Title VII, it is unlawful for an employer to discriminate based on race.

390.     Myers terminated Rush's employment.

391.     The reasons Myers asserts for terminating Rush are not truthful.

392.     Defendant terminated Rush because of Rush's race, African-American, in violation of Title VII, 42 U.S.C. §1981 and the DCHRA.

**Count VII:      Unlawful Family Responsibilities Discrimination, in Violation of the
D.C. Human Rights Act**

393.      Plaintiff Rush incorporates by reference all of the above-stated paragraphs as if
fully stated herein.

394.      Under the DCHRA, it is unlawful for an employer to discriminate based on
family responsibilities.

395.      Defendant terminated Rush's employment, and has at times asserted that it was
on account of Rush's being late for work.

396.      Defendant knew that Rush's lateness was on account of her childcare
responsibilities.

397.      The reasons Myers asserts for terminating Rush are not truthful.

398.      Defendant terminated Rush because of Rush's family responsibilities, in
violation of the DCHRA.


**V.      REMEDIES**

WHEREFORE, the Plaintiffs pray that the Court grant Ms. Britt and Ms. Rush the
following relief:

a.      Declaratory judgments that Defendant's conduct violated their rights;

b.      An order from this Court restoring them to their former positions at Fannie Mae;

c.      Compensatory damages against Defendants, for emotional, non-pecuniary harm
resulting as a consequence of Defendant's unlawful actions, in a precise amount to be
determined by the jury;

d.      Compensatory damages, for consequential financial harms incurred by Plaintiffs
as a result of Defendants' unlawful actions, including but not limited to lost wages and benefits,
including overtime pay, and future lost wages and benefits;

e.       Punitive damages in an amount to be determined by the jury;

f.       Prejudgment and post-judgment interest;

g.       Reasonable attorneys' fees, expenses and costs, as specifically authorized by

statute, to be calculated by the Court pursuant to the established procedures and precedents;

and

h.       Such further and other relief as the court shall deem just and proper.

## VI.      DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all issues so triable.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC

/s/

_____

Leizer Z. Goldsmith    D.C  Bar No. 419544
Kyle G. Ingram         D.C. Bar No. 994849
5335 Wisconsin Avenue, N.W., Suite 440
Washington, D.C. 20015
Telephone: (202) 895-1506
Facsimile: (202) 318-0798
Counsel for Plaintiffs LaWanda Britt and Michelle Rush