**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                 )
MICHELLE RUSH and                )
LAWANDA BRITT,                   )
                                 )
            Plaintiffs,          )
                                 )      Civil No. 15-1569
         v.                      )
                                 )
FEDERAL NATIONAL MORTGAGE        )
ASSOCIATION, a/k/a Fannie        )
Mae                              )
                                 )
            Defendant.           )
_____)
```

**MEMORADUM OPINION**

Plaintiffs Lawanda Britt ("Ms. Britt") and Michelle Rush ("Ms. Rush") (collectively "Plaintiffs") filed suit against Defendant Federal National Mortgage Association ("Defendant" or "Fannie Mae") on September 25, 2015. *See generally*, First Am. Compl., ECF No. 1-2. Plaintiffs allege they were terminated because of religious and racial discrimination, retaliation and other unlawful discrimination. *Id.* ¶¶ 346-98. Specifically, Ms. Britt alleges four claims: religious discrimination in employment termination in violation of the D.C. Human Rights Act (DCHRA) and Title VII (Count I); retaliation firing due to racial and religious Discrimination in Violation of Title VII, 42 U.S.C. § 1981 and DCHRA (Count II); unlawful hostile working environment on account of color under Title VII and DCHRA (Count

1

III); and failure to provide reasonable religious accommodations under Title VII and DCHRA (Count IV). *Id*. ¶¶ 346-78. Ms. Rush alleges three claims: retaliation by employment termination in violation of DCHRA (Count V); race discrimination in violation of the DCHRA (Count VI); and unlawful family responsibilities discrimination in violation of DCHRA (Count VII). *Id*. ¶¶ 378-92.

Ms. Britt and Ms. Rush filed timely charges with the EEOC and the D.C. Office of Human Rights. *Id*. ¶ 6, 20.[1] On November 5, 2015, Fannie Mae filed a Motion for Summary Judgment. Def.'s Mot. Summ. J., ECF No. 7 at 1. Upon review of Defendants' motions, responses and replies thereto and for the reasons discussed below, Defendant's Motions for Summary Judgment as to Ms. Britt and Ms. Rush's claims are **GRANTED**.[2]

---

[1] Both Plaintiffs participated in independent arbitration hearings through JAMS, each lasting at least one week. Def.'s Mem. Supp. Summ. J. Britt, ECF No. 7-1 at 2. In separate 16-page opinions, JAMS arbitrators ruled in favor of Fannie Mae. *Id.* at 3. However, pursuant to Fannie Mae's arbitration policy, "[p]laintiff has 30 days from the date of the final award to reject the award" and "[d]efendant agrees to toll the statute of limitations for 60 days after a final award has been rejected." First Am. Compl. ¶¶ 14-17 and ¶¶ 27-29. Plaintiffs rejected the JAMS rulings and filed this suit. The record before the Court includes arbitration testimony.

[2] Ms. Rush conceded that her Title VII claims were untimely prior to arbitration. Def.'s Mem. Supp. Rush at 23. Although Ms. Rush's claims are now limited to her D.C. Human Rights Act claims, Fannie Mae asserts that its federal charter "vests it with an unconditional right to remove this action to this Court" and that the Court therefore has subject matter jurisdiction over Rush's state law claims pursuant to 12 U.S.C. § 1723a(a); *see Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v.*

## I.   Background

### A. Ms. Britt's employment at Fannie Mae

Ms. Britt identifies as multi-race, light skinned, and Muslim. Pl.'s Resp. Def.'s Statement Facts, ECF No. 14-3 ¶ 2. Ms. Britt was hired by Fannie Mae as an Administrative Assistant in 2004 on a contract basis. *Id.* ¶ 1; Def.'s Statement Facts, ECF No. 9-1, ¶ 1.[3] In 2007, Ms. Britt joined the Records Management Team and was responsible for executing duties related to Fannie Mae's Offsite Storage Program, including processing requests to ship and receive boxes from Iron Mountain (Fannie Mae's offsite storage vendor), drafting policies and procedures for the program, and serving as liaison between Fannie Mae and Iron Mountain. *Id.* ¶ 3. Ms. Britt was paid by the hour as a non-exempt employee. Britt's Final Arb. Award, ECF No. 6-79 at 2.

In 2011, Nancy Jardini ("Ms. Jardini"), Fannie Mae's Chief Compliance and Ethics officer, restructured the Records Management Team. Def.'s Statement Facts ¶ 6. Ms. Jardini placed Jaci Myers ("Ms. Myers") in charge of the Records Management team. *Id.* ¶ 8. Ms. Jardini and Ms. Myers are white. Ms. Myers

---

*Raines*, 534 F. 3d 779 (D.C. Cir. 2008) ("[w]e find that there is federal jurisdiction because the Fannie Mae "sue and be sued" provision expressly refers to the federal courts . . . .").

[3] The Court generally relies on Defendant' statement of facts, but notes when Plaintiff's statement of facts differ significantly.

selected Sonia Trask ("Ms. Trask") to serve as a Project
Manager. Ms. Trask became Ms. Britt's immediate supervisor and
is black, of Caribbean decent. *Id.* ¶ 12. Ms. Myers selected
Erica Wilson ("Ms. Wilson") to serve as Director of Records
Management. *Id.* ¶ 20. Ms. Wilson is black and was Ms. Britt's
second-level supervisor. *Id.* Ms. Trask and Ms. Wilson were both
hired for positions previously held my white managers who were
terminated as a result of the restructuring. *Id.* ¶ 14, 20.

### B. Issues with Ms. Britt's performance

From late 2011 through the fall of 2012, the Records
Management Team leadership began documenting Ms. Britt's
performance deficiencies. Def.'s Statement Facts ¶ 111. Starting
in early 2012, weekly meetings were held where Britt was
"counseled about management's concerns including the timeliness
of her work, typographical errors in her written projects, and
the disproportionate amount of supervision she required." *Id.*
Four specific trouble areas were identified, including: (1)
issues with the off-site storage program; (2) out on reference
boxes; (3) the Iron Mountain portal; and (4) O-level boxes. Each
of these four areas, discussed in more detail below, are
highlighted in Ms. Britt's termination memorandum, dated October
4, 2012. Termination Memorandum, ECF No. 9-66.

### 1. Dashboard for Off-site Storage Program

At the end of 2011, Ms. Wilson completed a risk assessment of the offsite storage program. Def.'s Statement Facts ¶ 28. Ms. Britt assisted with the assessment and although Ms. Wilson concluded that Ms. Britt could effectively manage the daily offsite storage functions, Ms. Wilson observed that Ms. Britt "lacked an appreciation of the legal, financial and reputational risks involved in the Offsite Storage Program." *Id.*

Ms. Wilson grew concerned about Fannie Mae's inability to monitor offsite storage activity. Def.'s Statement Facts ¶ 100. As a result, Ms. Britt was tasked with designing a high-level dashboard that would provide "a snapshot of the Program by division, including the volume of boxes shipped, retrieved, or stored." *Id.* Ms. Wilson assumed Ms. Britt had the technical skills to develop a dashboard because such technology was commonly used at Fannie Mae. *Id.* ¶ 101. However, Ms. Britt struggled to produce a dashboard as requested by Ms. Wilson. *Id.*

Ms. Britt alleges that Ms. Myers "set [her] up to fail on [the dashboard] project to justify her later termination." First Am. Compl. ¶¶ 68-9. In support of this allegation, Ms. Britt claims that she was "enthusiastic" about the project, but had never been trained in management reporting. *Id.* Ms. Britt alleges that despite producing drafts of the dashboard, Ms. Myers did not provide any feedback or other opportunities for training. *Id.* ¶

87. Fannie Mae insists that Ms. Britt failed to request additional training and declined to follow-up on trainings recommended by her co-worker Lisa Summers ("Ms. Summers"). *Id.* ¶¶ 103-7. According to Ms. Summers, Ms. Britt was "frustrated with the dashboard project and appeared to lose interest." *Id.* ¶ 105.

### 2. Out on Reference Boxes

In early 2012, Ms. Wilson and the Records Management Team discovered that nearly 2,000 boxes of Fannie Mae records were missing despite being identified as retrieved from Iron Mountain. Def.'s Statement Facts ¶ 78. These boxes contained sensitive, confidential information such as borrower security social security and bank account numbers. *Id.* ¶ 88. Defendant maintains that it was Ms. Britt's obligation to monitor the location of the boxes. *Id.* ¶ 79. When the Records Management Team asked Ms. Britt to develop a system to locate the missing boxes, Ms. Britt failed and the assignment was reassigned to Ms. Trask. Def.'s Statement Facts ¶ 89.

### 3. Iron Mountain Portal

Ms. Wilson also identified a risk relating to the web portal that connected Fannie Mae and Iron Mountain. *Id.* ¶ 91. A number of employees and former employees had access to the portal and could ship and receive Fannie Mae boxes and even had the ability to have boxes with confidential information shipped to their

homes. *Id.* Ms. Britt was responsible for managing this system. *Id.* Ms. Wilson asserts that Ms. Britt "did not grasp the financial, reputational and legal risks associated with this lack of control" and did not take any remedial steps to fix the issue when it was brought to her attention. *Id.* ¶ 94.

### 4. O-level boxes

Another example highlighted by Fannie Mae as indicative of Ms. Britt's inadequate work performance relates to Ms. Britt's inability to devise a plan for determining whether any confidential or business documents existed in boxes that were left at an old office location. *Id.* ¶ 96. Ms. Wilson alleges that Ms. Britt's plan was "ill-conceived and poorly written," and that the two met several times to discuss how the plan could be improved. *Id.* ¶ 97. Ms. Britt admits that the project was assigned to her, but contends neither Ms. Wilson nor Ms. Myers communicated their lack of satisfaction with how she carried out her responsibilities. Pl.'s Mem. Opp. at 32.

### C. Ms. Britt's Ramadan Request

On July 12, 2012, Ms. Britt requested that her regular hours of 9:30 a.m. to 6:00 p.m. be modified to 7:30 a.m. to 4:00 p.m. so that she "could be home for the Maghrib prayer, the final prayer before the end of fasting." First Am. Compl. ¶ 101.[4]

---

[4] During the holy month of Ramadan, Muslims fast from sun rise to sun set. ECF No. 9-57.

Prior to submitting a formal request, Ms. Britt testified that she spoke to Ms. Wilson in June 2012 about her request to modify her hours. Britt Arb. Tr., ECF No. 9-3 at 67. Ms. Wilson responded that modifying Ms. Britt's hours "would be no problem." *Id.; see also* 814: 11-13. Later, Ms. Wilson's superiors informed her that Ms. Britt's request should be submitted to Marian Stevens ("Ms. Stevens"), Fannie Mae's Workplace Accommodations coordinator. Def.'s Statement Facts ¶ 117. In accordance with Ms. Wilson's instruction, Ms. Britt submitted her formal request for modified hours to Ms. Stevens on July 11, 2012. Britt-Stevens email exchange, ECF No. 9-58. Ms. Stevens denied the request due to a lack of evidence of Ms. Britt's "seriously held religious belief." *Id.* However, Ms. Wilson confirmed that she could grant Ms. Britt's request despite Human Resources' recommended denial. Def.'s Statement Facts ¶¶ 117-23. Ms. Wilson agreed to let Ms. Britt work from 8:30 a.m. to 5:00 p.m. on the condition that Ms. Britt notify Ms. Wilson each day by email when she arrived, when she left, and she was away from her desk for a significant period of time. *Id.* ¶ 122-23. Ms. Britt objected to the reporting condition, arguing it suggested "a lack of trust." Wilson-Britt email, ECF No. 9-61. Ms. Wilson responded by stating that Ms. Britt's "inability to independently complete project tasks (i.e. Out on

Reference, Offsite Storage Dashboard, etc.)" was her rationale
for including the condition. *Id.*

Ms. Britt met with Ms. Trask on July 18, 2012 and stated
that she could not "go through Ramadan with this unfair
treatment and issues". First Am. Compl. ¶ 266; Trask Summ.
Email, ECF No. 14-15. She further complained that "it was not
fair she was unable to change her hours due to Ramadan and
unfair about being told she cannot work independently. . . ."
*Id.* An email summary of this conversation was sent from Ms.
Trask to Ms. Wilson, Ms. Myers and Ms. Gaither. Trask Summ.
Email, ECF No. 14-15.

### D. Ms. Britt's 2012 mid-year review

Based on the various weaknesses in Ms. Britt's performance
discussed above, Ms. Wilson worked with Ms. Gaither to draft an
individual development plan (IDP) for Ms. Britt prior to her
2012 mid-year review. Def.'s Statement Facts ¶ 126. The IDP was
designed to (1) identify gaps in Ms. Britt's performance; (2)
note the tactical behaviors in need of improvement; (3) identify
training resources; and (4) set target completion dates. *Id.* ¶
126.

Ms. Britt's 2012 mid-year review took place on July 20,
2012. Britt July 2012 Review, ECF No. 9-63. Ms. Britt was rated
"on track" because, as Ms. Wilson testified, she was unsure
whether Ms. Britt's performance was "blurred by her reporting to

[Ms. Trask] and the contentious relationship or whether it was truly . . . [a] performance issue . . . ." *Id.* ¶ 125.[5] Nevertheless, Ms. Wilson gave Ms. Britt a "strong message" that she was "trending downward" in her performance. *Id.* ¶ 128.

Cognizant of her deficient performance in several areas, Ms. Britt attended her mid-year review with a prepared letter of defense. *Id.* ¶ 131. Ms. Rush helped Ms. Britt draft the letter which expressed Ms. Britt's concern about "the performance expectations that have been put upon [her] during 2012" and that she was being unfairly critiqued because she had never been given training nor was expected to perform the type of work now requested of her when she was first hired by Fannie Mae. Pl.'s Ex. 13. Specifically, Ms. Britt contends that Ms. Trask and Ms. Wilson "watched [her] struggle" with projects for weeks, "when in reality [she] had no idea what the report was expected to look like." *Id.* The letter itself makes no mention of Ramadan or religious or racial discrimination. Ms. Britt later testified that:

> In crafting [the defense letter] my emotions,
> how I was feeling at that time, my inability

---

[5] Although not relevant to the Court's ultimate resolution of this matter, the record shows that Ms. Britt and Ms. Trask had a contentious relationship. For example, Ms. Britt alleges that Ms. Trask said that if she lived in England, Ms. Britt would be privileged because people of Ms. Britt's skin tone were treated differently. First Am. Compl. ¶ 38. Ms. Trask allegedly "stomped around the office, sat on Britt's desk in a demeaning manner, screamed at Britt and belittled Britt." *Id.* ¶ 37.

to work independently, to me had nothing to do
with me requesting my hours be changed due to
Ramadan.

Def.'s Statement Facts ¶ 133 (citing Britt's testimony, Ex. 64).

**E. Ms. Britt's termination.**

Following Ms. Britt's 2012 mid-year review, Ms. Wilson

served as Ms. Britt's direct supervisor and continued to observe

a downward trend in Ms. Britt's performance. *Id.* ¶ 135. Although

Ms. Wilson concluded that Ms. Britt could run the daily off-site

storage operations effectively, she deemed that Ms. Britt

"lacked an overall understanding of the process and the skills

to lead the Offsite Storage Program into the future." Def.'s

Statement Facts ¶ 135. Ms. Wilson drafted a memorandum dated

October 4, 2012 recommending Ms. Britt be terminated

immediately. Ms. Gather reviewed the termination memo and

verified the factual details described therein. *Id.* ¶ 138.

Ms. Britt was terminated from employment on October 23,

2012. Compl. ¶ 185. Ms. Wilson signed the final memorandum

"Justification for Termination of LaWanda Britt," which stated

that Ms. Britt's failed to adequately perform her

responsibilities. *Id.* ¶ 177. These responsibilities included

management of the out on reference and O-level boxes, the

dashboard project, as well as consistent preparation of publish

ready, error-free deliverables. *Id.* ¶ 178-84. Ms. Wilson claims

she had no knowledge that Ms. Britt had voiced a concern that

she had been subjected to discrimination and asserts that her protected class did not factor into the decision to terminate Ms. Britt's employment. *Id.* ¶ 113.

### F. Ms. Rush's employment at Fannie Mae

Ms. Rush was hired by Fannie Mae in 2002 and by 2011 she served as a Compliance and Ethics Specialist IV on the Records Management Team. Def.'s Mem. Supp. Summ. J. Rush ("Def.'s Rush Mem. Supp."), ECF No. 11 at 5. Ms. Rush is African American and maintained a close relationship with Ms. Britt at work. For example, Ms. Rush assisted Ms. Britt in drafting Ms. Britt's July 2012 performance defense memorandum. First Am. Compl. ¶¶ 272-75.

When the Records Management Team was restructured in January 2012, one of the issues emphasized by leadership was timely arrival to work. Def.'s Rush Mem. Supp. at 7. Ms. Rush concedes that "Prior to July 20, 2012, [she] was late to work by a few minutes practically every day." First Am. Compl. ¶ 188. Ms. Myers informed Ms. Rush that being late even "one minute" would be considered an unscheduled absence. Def.'s Statement Facts ¶ 38. More than six unscheduled absences each year was cause for termination. Def.'s Rush Mem. Supp. at 8.

Because Ms. Rush established a pattern of arriving to work late, Ms. Myers began pulling badge reports in March 2012 to

determine exactly what time Ms. Rush was arriving to work.[6]
Def.'s Rush Mem. Supp. at 10. Ms. Rush concedes that according
to the badge reports, she was late 78 percent of the time as of
April 2012. First Am. Compl. ¶ 138. Ms. Rush's chronic tardiness
lead to an "off track" rating during her mid-year review in July
2012. Def.'s Rush Mem. Supp. at 13.

At some point around August 2012, Fannie Mae discovered
that Ms. Rush was "double badging" in an apparent effort to
misrepresent her time of arrival. Def.'s Rush Mem. Supp. at 19.
Ms. Rush would swipe her badge, then go park her car, and return
to the office and swipe her badge again. *Id.* Ultimately, Rush
was terminated on August 28, 2012 because "she consistently
arrived to the office after her agreed upon arrival time, failed
to follow explicit instructions that when she was going to be
late that she inform both Myers *and* Wilson, and because she
engaged in a scheme to distort her arrival time to the office
after being counseled that any further late arrivals could be
grounds for termination." *Id.* at 30.

## II.  Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary
judgment is appropriate if the pleadings on file, together with

---

[6] The "badge reports" indicate employee arrival times based on
when the employee swipes their employee card to enter Fannie
Mae. Def.'s Rush Mem. Supp. at 19.

13

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C. Cir. 1994).

In considering whether there is a triable issue of fact, the court must draw all reasonable inferences in favor of the non-moving party. *Tao,* 27 F.3d at 638. The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp.,* 477 U.S. at 324, 106 S. Ct. 2548. In employment discrimination cases, summary judgment is appropriate "where either evidence is insufficient to establish a *prima facie* case, or, assuming a *prima facie* case, there is no genuine issue of material fact that the defendant's articulated non-discriminatory reason for the challenged decision is

pretextual." *Paul v. Fed. Nat'l Mortgage Ass'n,* 697 F. Supp.
541, 553 (D.D.C. 1988) (citations omitted).

## III. Discussion

### A. Ms. Britt's retaliation claim was properly exhausted

Fannie Mae argues Ms. Britt failed to exhaust her
administrative remedies as to her retaliation claim because her
2013 amended EEOC charge "fails to contend that Wilson, or
anyone else at Fannie Mae, retaliated against her because she
raised complaints about such [religious] discrimination." Def.'s
Mem. Supp. at 15. Ms. Britt argues that the amended EEOC charge
incorporating religious discrimination "provided Fannie Mae with
notice of all the key elements to her charge, and neglected to
do just one thing: tie the retaliation allegation to the
particular protected activity that the evidence has now revealed
as decisive." Pl.'s Mem. Opp., ECF No. 14 at 7.

"A federal employee filing a Title VII action must exhaust his
or her administrative remedies before seeking judicial review."
*Brodetski v. Duffey,* 199 F.R.D. 14, 18 (D.D.C. 2001) (citing
*Brown v. Gen. Servs. Admin.,* 425 U.S. 820, 832–33, 96 S. Ct.
1961, 48 L.Ed.2d 402 (1976)). In addition to specific time
restraints, Title VII lawsuits following an EEOC charge must be
"limited in scope to claims that are 'like or reasonably related
to the allegations of the charge and growing out of such
allegations.'" *Park v. Howard Univ.,* 71 F.3d 904, 907 (D.C. Cir.

1995) (quoting *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). "At a minimum, the Title VII claim must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Park*, 71 F.3d at 907. The defendant has the burden of proving by a preponderance of the evidence that plaintiff failed to exhaust administrative remedies. *Tridico v. D.C.*, 130 F. Supp. 3d 17, 23 (D.D.C. 2015) (citing *Na'im v. Rice*, 577 F. Supp. 2d 361, 370 (D.D.C. 2008)) (other citations omitted).

The purpose of the administrative charge requirement is to give the charged party notice of all claims and to focus the issues for "prompt adjudication and decision." *Park*, 71 F. 3d at 907 (quoting *Laffey v. Northwest Airlines, Inc.*, 567 F. 2d 429, 472 (D.C. Cir. 1976)). Although not a "mere technicality," the administrative charge requirement is not intended to place a "heavy technical burden on individuals untrained in negotiating procedural labyrinths." *Id.* (internal quotation and citation omitted).

In this case, Ms. Britt's Amended 2013 EEOC Charge of Discrimination checks the race, religion and retaliation boxes. Britt's 2013 EEOC Charge, ECF No. 9-76. The charge further states:

> On November 1, 2004, I was hired by the respondent to work as an Administrative Assistant in the Portfolio Department. On

16

February 28, 2012, while being employed as a Project Analyst II in the Records Management Department, Jaclyn Myers, the White Managing Director of my department, harassed me and other employees (mostly Black) by subjecting us to verbal abuse (e.g., yelling and screaming) during a meeting. In approximately April of 2012, I complained to various management employees in the HR, Investigations and Ethics departments about this racial harassment. Thereafter, from April 2012 to October 2012, in retaliation for this protected activity and due to my race, I was adversely treated in various ways such as by being denied training, being stripped of job duties and being excluded from job-related meetings. Finally, on October 23, 2012, I was further retaliated against and discriminated against based upon my race being discharged from employment.

I believe that I was discriminated against based upon my race, Multi-Racial (Black/White/Native American), and retaliated against for having engaged in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

**I further state that on July 18, 2012, I was discriminated against based upon my religion (Muslim)** by being denied a reasonable accommodation (i.e., a change in my working hours from 9:00 a.m. to 6:00 p.m. to 7:30 a.m. to 4:00 p.m.). I requested this accommodation in order to facilitate my participation in evening prayer at my home with my family during Ramadan which extended from July 20, 2012 to August 20, 2012. Additionally, I believe I that I was denied this accommodation in retaliation for my previous racial harassment complaints that I lodged in approximately April of 2012.

**Furthermore, on July 18, 2012, in retaliation for my previous harassment complaints and based on my religion, Erica Wilson, the Managing Director, harassed me by more**

> **strictly monitoring my attendance (i.e., by requiring me to notify her each work day via email when I report to work in the morning and when I leave work for the day).** Non-Muslim co-workers were not subjected to this treatment.
>
> I believe that I have been discriminated against based upon my religion, Muslim, and retaliated against for having previously engaged in protected activity in April of 2012 in violation of Title VII of the Civil Rights Act of 1964, as amended.

*Id.*

Defendant claims that "[i]ndeed, the charge never even states that Britt ever raised a complaint about religious discrimination, let alone that she was supposedly punished for it." Def.'s Mem. Supp. at 15. This assertion is without merit. In addition to checking the boxes for discrimination based on race, religion and retaliation, Ms. Britt explicitly states that she "was discriminated against based upon my religion (Muslim)" and that she was harassed by Manager Erica Wilson "in retaliation for my previous harassment complaints and based on my religion . . . ." *Id.* Although Ms. Britt fails to specifically allege that her July 20, 2012 performance defense memo was a protest against religious discrimination and that she was retaliated against because of it, the facts she does allege are sufficient for the Court to conclude that Ms. Britt properly exhausted her administrative remedies because in addition to explicitly alleging a religious discrimination and retaliation

claim, the "overall scope" of Ms. Britt's EEOC charge was sufficient to trigger an investigation into whether she suffered an adverse action because of her religion. *See e.g. Tridico*, 130 F. Supp. at 24 (holding that Plaintiff stated a discrimination claim despite not including a "discrimination" heading in EEOC complaint because the facts included in EEOC complaint were "sufficient to trigger an investigation into whether plaintiff suffered an adverse action because of his religion.")

The cases cited by Defendant support this conclusion. For example, Fannie Mae relies on *Kerney v. Mountain States Health Alliance* for the proposition that Ms. Britt did not provide adequate notice of her religious retaliation claim. 894 F. Supp. 2d 776 (W.D. Va. 2012); Def. Mot. ¶¶ 15. Yet, the plaintiff's retaliation claim in *Kerney* failed because her EEOC charge did not "reasonably lead to the inference that she claimed retaliation," making no mention of her engaging in a protected activity for which she was subsequently terminated. *Kerney*, 894 F. Supp. 2d at 781. Unlike the plaintiff in *Kerney*, Ms. Britt made a specific reference to retaliation as a result of her alleged protected activity on July 18, 2012. Britt's 2013 EEOC Charge ("Furthermore, on July 18, 2012, in retaliation for my previous harassment complaints and based on my religion, Erica Wilson, the Managing Director, harassed me by more strictly monitoring my attendance"). For these reasons, Ms. Britt

19

properly exhausted her administrative remedies as to her religious retaliation claim.

### B. Ms. Rush's DCHRA claims are time barred

Fannie Mae argues that Ms. Rush's DCHRA claims are time barred because although Ms. Rush filed her online complaint with the D.C. Office of Human Rights within one year of her termination, she failed to assert a religious retaliation claim in that complaint, which is now the sole claim briefed by Ms. Rush. Def.'s Rush Mem. Supp. at 24. Ms. Rush maintains that she was not required to give notice of her religious retaliation claim. Rush Mem. Opp., ECF No. 14 at 3.

DCHRA claims must be filed "within one year of the allegedly unlawful incident's occurrence or discovery thereof." *Craig v. District of Columbia*, 74 F. Supp. 3d 349, 366 (D.D.C. 2014) (citing *Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp. 2d 71, 77 (D.D.C. 2009); *see also* D.C. Code § 2-1403. This one-year statute of limitations is tolled upon the timely filing of a complaint with the D.C. Office of Human Rights ("OHR") and charges filed with the EEOC in D.C. are automatically cross-filed with the D.C. Office of Human Rights. *Craig*, 74 F. Supp. 3d at 366 ("filing a charge with the EEOC suffices to toll the one-year statute of limitations for DCHRA claims.").

In this case, Ms. Rush was terminated on August 28, 2012 and Ms. Rush's counsel filed an online complaint with the D.C.

Office of Human Rights on August 27, 2013, within one year of her termination. Rush's August 27, 2013 email to OHR, ECF No. 14, Ex. 45. Neither party attaches the actual OHR complaint, but both submit an email from Ms. Rush's attorney to the OHR summarizing her claims. *Id.* Approximately one month later, Ms. Rush filed her notarized EEOC complaint. Rush's 2013 EEOC Charge, ECF No. 9-74. Fannie Mae does not challenge the timeliness of Ms. Rush's OHR complaint. *See* D.C. Reg. 4-705.2.1 ("Although the date of the online filing will constitute the filling date for the complaint, the finalized complaint shall be signed and verified before a notary public or other person duly authorized to administer oaths and take acknowledgements.").

Pursuant to D.C. Code § 2-1403.16(a), a plaintiff must choose to pursue his or her DCHRA claims through an administrative process or through a judicial forum. *Adams v. District of Columbia*, 740 F. Supp.2d 173, 190 (D.D.C. 2010) (citing *Carter v. Dist. of Columbia*, 980 A.2d 1217, 1223 (D.C. 2009) (explaining that "[t]he jurisdiction of the court and OHR are mutually exclusive in the first instance."). [7] Where a

---

[7] D.C. Code § 2-1403.16(a) states:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate, unless such person has filed a complaint hereunder;

plaintiff has filed a charge with the DCOHR, as Ms. Rush did in this matter, a suit may still be filed in Court so long as the plaintiff withdraws the DCOHR complaint or DCOHR dismisses the complaint for "administrative convenience." D.C. Code § 2-1403.16(a). Fannie Mae does not dispute that Ms. Rush properly withdrew her OHR charge on December 5, 2014. *See* Rush Mem. Opp. at 3, citing Rush's Administrative Dismissal without Prejudice letter, Ex. 43.

Nevertheless, as in the Title VII context, "it is only logical to limit the permissible scope of the civil action [in a DCHRA case] to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Craig v. District of Columbia*, 74 F. Supp. 3d 349, 366 (D.D.C. 2014) (quoting *Ivey v. District of Columbia*, 949 A.2d 607, 615 (D.C. 2008)). Therefore, the same "like or reasonably related" test is applied to determine whether a plaintiff's OHR complaint gave proper notice of all claims to all defendants. *Id.*

---

provided, that where the Office has dismissed such complaint on the grounds of administrative convenience, or where the complainant has withdrawn a complaint, such person shall maintain all rights to bring suit as if no complaint had been filed.

22

In response to Fannie Mae's argument that Ms. Rush failed to give notice of her religious retaliation claim, Ms. Rush first contends that D.C. Code § 2-1403.16(a) "clearly means that a defendant is not entitled to any sort of pre-lawsuit notification as to the particulars of a plaintiff's claims . . . ." Rush's Mem. Opp. at 4. Ms. Rush points to the statutory language that states "where . . . [t]he complainant has withdrawn a complaint, such person shall maintain all rights to bring suit **as if no complaint had been filed** . . . ." (emphasis in original). Ms. Rush cites to no other authority in support of her argument.

Considering the full context of the statutory language at issue, it is clear that the purpose of the language highlighted by Ms. Rush is to emphasize that where an OHR complaint is withdrawn or dismissed on administrative grounds, a plaintiff may pursue his or her claims in a judicial forum. *See e.g. Adams v. District of Columbia*, 740 F. Supp. 2d 173, 190 (D.D.C. 2010) ("In order to successfully withdraw a complaint before the DCOHR, and thus, preserve the right to bring the **same claim in court**, a complainant must request withdrawal prior to the completion of the [DCOHR's] investigation and findings.") (citing D.C. Code § 2-1403.04) (internal quotation marks omitted) (emphasis added).

Next Ms. Rush maintains that even if Title VII "like or related" principles are applied to her DCHRA claims, she "easily meets the requirement of timely exhausting her administrative remedies, since she filed a letter with the OHR alleging that she was fired because of the July 2012 memo, which was later updated and verified by a charge asserting retaliation, and informing the OHR investigator of Britt's religious request and its denial." Rush's Mem. Opp. at 4, n 5. However, the record does not support Ms. Rush's claim.[8]

Neither the email submitted by Ms. Rush's counsel summarizing her claims, nor the text of her EEOC complaint mention a religious retaliation claim. The email sent to OHR by Ms. Rush's counsel states in relevant part:

> 9. On or around July 20, 2012, Ms. Britt **protested improper performance expectations placed on her in writing, coupled with a lack of training** to assist [sic] meet her new obligations. Ms. Rush helped Ms. Britt write the protest.
>
> 10. Shortly thereafter, Ms. Myers deputy, Erica Wilson, commented to Rush, in a threatening tone, "I know your writing" in relation to Ms. Rush's assisting Ms. Britt with her written work. Upon information and belief, Ms. Wilson was referring specifically to Ms. Britt's protest.

---

[8]  To the extent a supplemental letter not analyzed in this opinion was submitted to the OHR by Ms. Rush, she failed to submit that letter to the Court for review.

Rush's August 27, 2013 email to OHR, ECF No. 14, Ex. 45

(emphasis added). Ms. Rush's EEOC complaint checks the race,

religion and retaliation boxes. Rush's 2013 EEOC Charge, ECF No.

9-74. In relevant part, Ms. Rush charged:

> Retaliation (Race-African American) in March
> 2012 **I was questioned about a co-worker's
> (African American) internal discrimination
> complaint** and in response I expressed that my
> supervisor's supervisor routinely used an
> offensive and harsh tone in an effort to
> embarrass African American employees.
>
> Discharge (race-African American/Family
> Responsibilities/Retaliation) on August 28,
> 2012 was discharged based on time and
> attendance. Even though I had requested to be
> allowed to come in to work at 10:00am my
> request was denied. I had trouble getting to
> work at the requested 9:45am time frame due to
> my family responsibilities. I believe I was
> terminated due to my race (African American),
> my family responsibilities and **in retaliation
> for my participation in my co-workers internal
> EEO complaint.**

*Id.*

Neither Ms. Rush's EEOC charge nor her counsel's email to

OHR mention a religious retaliation claim. Ms. Rush's EEOC

charge does not even mention the July 2012 memo that she helped

Ms. Britt draft. *Id.*[9] While the email sent to DCOHR by Ms. Rush's

---

[9] Although Ms. Rush's EEOC charge states "I believe I was
terminated due to my race (African American) . . . in
retaliation for my participation in my co-workers internal EEO
complaint" the EEO charge mentioned appears to refer to Ms.
Britt's complaint of racial discrimination which is mentioned
earlier in the charge, not Ms. Britt's July 2012 memo that she
now claims was a protest against religious discrimination.
Rush's 2013 EEOC Charge, ECF No. 9-74.

counsel mentions the assistance Ms. Rush provided Ms. Britt in drafting the July 2012 memo, the purpose of the memo is described as a protest of "improper performance expectations placed on [Ms. Britt] in writing, coupled with a lack of training." Rush's August 27, 2013 email to OHR, ECF No. 14, Ex. 45. Because Ms. Rush makes no allegation of religious retaliation and does not assert that the July 2012 memo was a protest against religious discrimination, no reasonable investigation into the facts alleged would have put Fannie Mae on notice of Ms. Rush's religious retaliation claim. *See e.g. Craig*, 74 F. Supp. 3d at 368 (dismissing DCHRA claim for failure to give notice of alleged perpetrator of the uncharged acts); *Zelaya v. UNICCO Service Co.*, 587 F. Supp. 2d 277, 285 (D.D.C. 2008) (same).[10] Ms. Rush has therefore did not provide Fannie Mae with proper notice of her alleged religious retaliation claim.

### C. Ms. Britt's Religious Discrimination Retaliation Claim

Fannie Mae argues Ms. Britt has failed to demonstrate a genuine issue of material fact as to her religious retaliation

---

[10] Even if the court were to find that Ms. Rush gave proper notice to Fannie Mae for her religious retaliation claim under the DCHRA, Ms. Rush's claim fails for substantially the same reasons Ms. Britt's claim fails. Ms. Rush's theory of religious retaliation relies on the flawed proposition that Ms. Britt's performance defense letter constituted a legally protected complaint of religious discrimination. Rush Mem. Opp., ECF No. 14-2 at 8-9. This assertion fails for the same reasons Ms. Britt's religious retaliation claim fails, as discussed below.

claims under Title VII and the DCHRA. *See generally,* Def.'s Mem. Supp, ECF No. 7 and Def.'s Reply, ECF No. 15. Fannie Mae urges the Court to grant its motion and dismiss Ms. Britt's retaliation claim because she: (1) did not engage in any protected activity; (2) her termination was unconnected to any protected activity; and (3) she failed to demonstrate discriminatory pretext. Def.'s Mem. Supp. at 18-30. Ms. Britt maintains that she engaged in protected activity and insists questions of fact remain for a jury to consider when determining whether her termination was pretextual. Pl.'s Mem. Opp., ECF No. 14.

### 1. Legal Standard for consideration of Religious Retaliation claim under Title VII and DCHRA

Under Title VII, it is unlawful for an employer to discriminate against employees "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To prevail on a retaliation claim, the plaintiff must show "(1) that he engaged in a statutorily protected activity; (2) that he suffered materially adverse action by employer and that (3) his protected activity was the but-for cause of the  . . . adverse action by the employer." *Frances v. Perez*, 970 F.

27

Supp.2d 48, 66 (D.D.C. 2013) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).[11]

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims and requires that a plaintiff first make a prima facie case of retaliation by presenting credible facts. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Abdelkarim v. Tomlinson*, 605 F. Supp. 2d 116, 120-21 (D.D.C. 2009). Once a prima facie case has been made, the burden shifts to the defendant to rebut the presumption of discrimination by "producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *Id.* Finally, if the rebuttal is successful, the burden shifts back to the plaintiff to show that the employer's nondiscriminatory reason was pretext. *Id.*

However, where the defendant asserts a legitimate, non-retaliatory explanation for the alleged adverse actions, "the district court should . . . proceed[] to the ultimate issue of

---

[11] The Court's analysis of Ms. Britt's Title VII retaliation claim applies equally to her retaliation claim under DCHRA. *See Kennedy v. Nat'l R.R. Passenger Corp.*, 139 F. Supp. 3d 48, 58 n.3 (D.D.C. 2015) ("The same analysis applies to the plaintiff's claims under both Title VII and the DCHRA and these claims thus rise and fall together.") *Burley,* 801 F.3d at 296, 2015 WL 5474078, at *3; *See also Bryant v. District of Columbia,* 102 A.3d 264, 268 (D.C.2014) ("[t]he analytical framework for establishing a prima facie case of retaliation is the same under both the DCHRA and Title VII").

retaliation *vel non* instead of evaluating whether [plaintiff] made out a prima facie case." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (citing *United States Postal Service Bd. Of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (holding that once an employer asserts a legitimate, nondiscriminatory reason for its action, it "has done everything that would be required . . . if the plaintiff had properly made out a *prima facie* case," so "whether the plaintiff really did so is no longer relevant.")).

In this case, the parties do not dispute that Ms. Britt's October 2012 termination constitutes an adverse employment action. Fannie Mae maintains that Ms. Britt's termination was due to poor performance. Def.'s Reply Mem. at 17-18. As such, the central question before the Court is whether Ms. Britt has presented evidence that "creates a material dispute on the ultimate issue of retaliation either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Francis*, 970 F. Supp.2d at 66 (quoting *Aikens*, 460 U.S. at 716) (internal quotations omitted). Put another way, the Court must consider:

> Whether the jury could infer discrimination
> from the combination of (1) the plaintiff's
> prima facie case; (2) any evidence the
> plaintiff presents to attack the employer's
> proffered explanation for its actions; and (3)
> any further evidence of discrimination that
> may be available to the plaintiff (such as

> independent    evidence    of    discriminatory
> statements  or  attitudes  on  the  part  of  the
> employer) . . .

*Waterhouse v. D.C.*, 298 F.3d 989, 993 (D.C. Cir. 2002)

(internal quotations omitted).

### 2. Ms. Britt has failed to produce sufficient evidence of retaliation *vel non*

Ms. Britt has failed to produce sufficient circumstantial evidence which a reasonable jury could rely upon to conclude that Ms. Britt was terminated in retaliation for protests against religious discrimination. Ms. Britt's claim of unlawful retaliation is based on her view that she engaged in protected activity when she orally expressed disappointment to Ms. Trask about the denial of her Ramadan request and through her July 20, 2012 written letter in defense of her performance, which was given to Ms. Wilson at her mid-year 2012 review. Pl.'s Mem. Opp. at 10. Ms. Britt argues that Ms. Wilson was so angered by Ms. Britt's July 20, 2012 letter that she soon thereafter reassigned Ms. Britt's duties to other employees, and within three months, terminated Ms. Britt in retaliation for expressing her belief that she was being discriminated against because she was Muslim. *Id.* at 14. There are several critical pieces of evidence relied up on by Ms. Britt that deserve close scrutiny. These include: (1) facts surrounding Ms. Britt's request for modified hours during Ramadan; (2) the email from Ms. Trask to Ms. Wilson, Ms.

Myers and Ms. Gaither summarizing Ms. Trask's July 19, 2012 conversation with Ms. Trask; (3) Ms. Britt's letter of defense; and (4) the credibility of Fannie Mae's non-discriminatory rationale for termination. Each will be discussed in turn.

### a. Facts surrounding Ms. Britt's request for modified hours during Ramadan

Ms. Britt argues that it is "undisputed that Wilson rejected [her] request . . ." for no other reason other than "Wilson's anti-Muslim animus." Pl.'s Mem. Opp. at 9-10. However, the record evidence, including Ms. Britt's own testimony, contradicts this assertion. Prior to submitting a formal request, Ms. Britt testified that she spoke to Ms. Wilson in June 2012 about her request to modify her hours. Britt Arb. Tr., ECF No. 9-3 at 67. Ms. Wilson responded that modifying Ms. Britt's hours "would be no problem." *Id.; see also* 814: 11-13. Later, MS. Wilson's superiors informed her that Ms. Britt's request should be submitted to Ms. Stevens, Fannie Mae's Workplace Accommodations coordinator. Def.'s Statement Facts ¶ 117.

In accordance with Ms. Wilson's instruction, Ms. Britt submitted her formal request for modified hours to Ms. Stevens on July 11, 2012. Britt-Stevens email exchange, ECF No. 9-58. After receiving documentation from Ms. Britt about Ramadan, Ms. Stevens denied Ms. Britt's request because she failed to provide

"any information that indicates that your request for accommodation (earlier hours) is based on your sincerely held religious belief as opposed to a convenience for yourself." *Id.* Despite this formal denial, Ms. Wilson confirmed that she possessed the managerial discretion to override HR's denial and grant Ms. Britt's request for modified hours during Ramadan. Def.'s Statement Facts ¶ 121. Although discouraged by HR, Ms. Wilson granted Ms. Britt's request, albeit modified by one hour from her original request (from 8:30 a.m. to 5:00 p.m. rather than Britt's requested hours of 7:30 a.m. to 4:00 p.m.). Wilson-Britt email, ECF No. 9-61. The one condition Ms. Wilson placed on this accommodation, as recommended by Ms. Gaither, was that Ms. Britt send Ms. Wilson an email when she arrived and departed work and when she would be away from her desk for significant periods of time during the day. *Id.*; Def.'s Statement of Facts ¶ 122.

Offended by this requirement, Ms. Britt responded "[m]y getting to work on time or working a full day has never been an issue. Why am I being made to report in like this? That suggest [sic] lack of trust." Wilson-Britt email, ECF No. 9-61. Ms. Wilson replied "[g]iven your inability to independently complete project tasks (i.e. Out on Reference, Offsite Storage Dashboard, etc.) this is one of the conditions I am requiring. There is not

a "lack of trust" rather a performance concern which we have previously discussed. Happy to discuss further." *Id.*

In direct contradiction of these facts, Ms. Britt contends throughout her brief that Ms. Wilson "denied" her request for modified hours and that she was "required to report her arrival and departure from work and movements around the office" *because* she made the request, rather than as a condition of the request being granted. Pl.'s Mem. Opp. at 9. As Britt argues:

> Wilson admits telling Britt that the only reason for this new and unprecedented requirement, was that Britt had requested the Ramadan hours accommodation. It is unsurprising that when Wilson failed to provide a reasonable answer, Britt would understand that Wilson's denial of religious accommodations that should have been afforded, was for no reason other than Wilson's anti-Muslim animus.

*Id.* at 9-10. The record demonstrates that the reporting requirement was a *condition* placed on Ms. Britt's modified hours due to Ms. Gaither's concern that Ms. Britt normally arrived to work between 9:00 a.m. and 9:30 a.m. and had already received an Memorandum of Concern related to time and attendance. Def.'s Statement Fact ¶ 122.

Ms. Britt's effort to portray Ms. Wilson as possessing an anti-Muslim animus fails. Ms. Britt does not allege that Ms. Wilson expressed her anti-Muslim animus in any other way beyond allegedly denying her Ramadan accommodation. Contrary to Ms.

Britt's assertions, the record evidence shows that Ms. Wilson exercised her discretion, against the advice of HR, to accommodate Ms. Britt's request for modified hours during Ramadan. As such, Ms. Britt has failed to identify facts sufficient for a reasonable juror to conclude that Ms. Wilson's desire to retaliate against Ms. Britt was the "but for" cause of Ms. Britt's termination. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013) (holding that "Title VII retaliation claims must be proved according to traditional principles of but-for causation" which requires "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").

> **b. Ms. Trask's July 19, 2012 email summary does not support Ms. Britt's claim that she engaged in protected activity**

Ms. Britt argues that her oral expression of frustration to Ms. Trask about her modified hours' request constitutes protected activity (i.e. opposing religious discrimination). Pl.'s Mem. Opp. at 10. On July 19, 2012, Ms. Trask sent an email summarizing her conversation with Ms. Britt to Ms. Wilson, Ms. Myers and Ms. Gaither. Trask Summ. Email, ECF No. 14-15. The email summarizes eighteen points and all but two pertain to Ms. Britt's performance. *Id.* The two points that do not directly pertain to Ms. Britt's performance relate to what Ms. Britt

34

alleges was her "unfair treatment" as a result of her Ramadan request. *Id.* As summarized by Ms. Trask:

> 16. She [Ms. Britt] cannot go through Ramadan with this unfair treatment and issues.
>
> 17. It was not fair she was unable to change her hours due to Ramadan and unfair about being told she cannot work independently --- Erica told her this on 7/18 and she was not feeling well at the time and she is not feeling well now.

*Id.* Notably, Ms. Trask's email summary does not express the sentiment that Ms. Britt felt discriminated against because she is Muslim or because of her Ramadan request. *Id.* Rather, the email summary indicates that Ms. Britt was upset by her supervisors' concern about her ability to arrive to work in a timely fashion and complete tasks independently. *Id.*

### c. Ms. Britt's performance defense letter does not support Ms. Britt's claim that she engaged in protected activity

Ms. Britt argues that her July 20, 2012 performance defense letter also constitutes a protest of protected activity. Pl.'s Mem. Opp. at 12. Ms. Britt contends that she:

> [r]easonably believed that the denial of her Ramadan schedule change was an unlawful failure to accommodate. Britt——through Rush—— opposed the practice of not providing her with an accommodation by attacking the bogus foundation for not accommodating her——the alleged performance shortcoming.

*Id.* Fannie Mae argues that Ms. Britt's performance defense letter does not constitute a protest of protected activity

because "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." Def.'s Reply Mem. at 7 (citing *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 84 (D.D.C. 2003).

The facts surrounding the development and content of Ms. Britt's protest letter do not provide a basis for any reasonable juror to conclude that the letter was written as a protest of protected activity. First, Ms. Britt's performance defense letter does not specifically mention Ramadan or religious discrimination. Britt Defense Letter, ECF No. 9-65. Rather, Ms. Britt emphasizes the reporting requirement that she asserts was placed on her because she made the Ramadan request (rather than a condition of her request being granted). In short, Ms. Britt's claim that her performance defense letter constitutes protected activity is not supported by the text of July 20, 2012 memo because the memo does not allege that she was discriminated against because she was Muslim, or even because she made a request for modified hours during Ramadan.

Second, Ms. Britt acknowledges that she began working with Ms. Rush to draft her letter of defense several months before her July 2012 mid-year review. Pl.'s Mem. Opp. at 14 ("Defendant [] points to Britt's testimony that the letter took several months to craft, and that Britt omitted direct references to Ramadan in the letter. But so what?"). The earliest Ms. Britt

36

raised her Ramadan request with Ms. Wilson was in June 2012.
Britt Arb Test., ECF No. 9-3 at 67, 814: 11-13. This means that
Ms. Britt was well aware of specific concerns with her
performance before she made her religious accommodation request.

Indeed, Ms. Britt was concerned enough about her negative
performance reviews to request help from Ms. Rush in drafting a
letter to defend her performance months *before* she made her
Ramadan request. Consistent with these facts, the vast majority
of Ms. Britt's letter focuses on her concern about a lack of
training and unreasonable expectations:

> This letter is to express my deep concern
> about performance expectations that have been
> put upon me during 2012. [] I attempted to
> create graphs, etc., but I have never been
> trained to produce dashboards and management
> reporting and, given my employee level, I feel
> strongly that I should not have been expected
> to. [] I feel as though I was set up to fail
> and did not receive the level of support from
> you or my manager needed to complete this
> effort.

*Id.* 1-2.[12] At most, Ms. Britt's letter of defense communicates a
general complaint of "unfair treatment." *Id.* As such, Ms.

---

[12] Ms. Britt's brief includes block quotes of her performance
defense memo with bracketed text that was ***not*** included in the
memo. Pl.'s Mem. Opp. at 10. The Court agrees with Fannie Mae's
argument that "[t]he mere fact that counsel found it necessary
to rewrite the memorandum to include references to Ramadan and
religious discrimination is powerful evidence that no reasonable
reader could be expected to understand the document as a
complaint opposing religious discrimination." Def.'s Mem. Reply
at 9-10.

Britt's letter does not constitute a protest of protected activity. *Robbins v. Dist. of Columbia*, 67 F. Supp. 3d 141 (D.D.C. 2014) (dismissing a Title VII retaliation claim where letter that Plaintiff claimed was a protest of protected activity "did not mention race or any other protected status").

### G. Credibility of Fannie Mae's non-discriminatory rationale for termination

Fannie Mae argues that Ms. Britt cannot demonstrate that her termination was pretextual because undisputed facts document Ms. Britt's performance deficiencies months before she made her religious accommodation request. Def.'s Mem. Supp. at 14-24. Ms. Britt maintains that pretext is evident from the fact that her duties were stripped from her shortly after her "on track" July 2012 mid-year review. Pl.'s Mem. Opp. at 22.[13]

Based on the facts in this case, no reasonable juror could conclude that Ms. Britt's termination was pretextual. First, the termination memorandum drafted by Ms. Wilson on October 4, 2012 reviews a comprehensive set of performance deficiencies, and many of those shortcomings were documented and discussed months before Ms. Britt's July 2012 mid-year review. Termination

---

[13] At least half of Ms. Britt's 46 page opposition brief includes numerous headings relating to pretext. Pl.'s Mem. Opp. at 18-46. Many of Ms. Britt's arguments rely on facts alleged that are not supported by the record, as discussed by the Court *supra.*

Memorandum, ECF No. 9-66. For example, Ms. Britt's termination memorandum recounts a June 15, 2012 conversation Ms. Wilson had with Ms. Britt wherein Ms. Wilson "provided specific examples of unacceptable behaviors which continued since April that I observed directly." *Id.* at 1. Also, the dashboard assignment was given to Ms. Britt in early 2012. Def.'s Statement of Facts ¶ 100-01. At least three months after being assigned the dashboard task, Ms. Wilson's May 30, 2012 handwritten note indicates that Ms. Britt failed to produce a deliverable product. Wilson Notes, ECF No. 9-21.

Notably, the two documents that Ms. Britt points to as protests of protected activity confirm that her performance was falling short of her superiors' expectations since early 2012. Ms. Trask's July 19, 2012 email summary relays Ms. Britt's feeling that she was "not qualified and trained to work on the new projects, such as the Offsite Storage dashboard and procedures." Pl.'s Ex. 11 at ECF No. 14-15. Ms. Britt also complained that her drafts were to "the best of her abilities, but they are never good enough for me and Erica/Jaci." *Id*. Similarly, the stated purpose of Ms. Britt's performance defense letter was to "express my deep concern about performance expectations that have been put upon me during 2012." Britt Defense Letter, ECF No. 9-65. "I attempted to create graphs, etc., but I have never been trained to produce dashboards and

management reporting and, given my employee level, I feel strongly that I should not have been expected to." *Id.*

Despite this evidence, Ms. Britt argues that her "on track" rating in July 2012 shows that Ms. Wilson retaliated against her in anger for presenting her letter of defense. Pl.'s Mem. Opp. at 14. Ms. Wilson testified that she rated Ms. Britt as "on track" because she was unsure whether Ms. Britt's performance was "blurred by her reporting to [Ms. Trask] and the contentious relationship or whether it was truly . . . [a] performance issue . . . ." *Id.* ¶ 125.[14] Nevertheless, Ms. Wilson gave Ms. Britt the "strong message" that she was "trending downward" in her performance. *Id.* ¶ 128. Consistent with this rationale, Ms. Wilson worked with Ms. Gaither to draft an individual development plan (IDP) for Ms. Britt prior to her 2012 mid-year review. Def.'s Statement Facts ¶ 126. The IDP was designed to (1) identify gaps in Ms. Britt's performance, (2) note the tactical behaviors in need of improvement; (3) identify training resources; and (4) set target completion dates. *Id.* ¶ 126. Because substantial record evidence documents Ms. Britt's

---

[14]    The facts underpinning Ms. Britt and Ms. Trask's contentious relationship do not create a triable issue of fact on her religious retaliation claims because Ms. Britt's allegations against Ms. Trask focus on her alleged racial discrimination. Britt's Final Arb. Award, ECF No. 6-79 at 3.

performance deficiencies, no reasonable juror could agree with her argument that her termination was pretextual.

### D. Ms. Britt concedes her other three claims

Ms. Britt dedicates less than two pages at the end of her 46 page opposition brief to address her religious and racial discrimination claims and her denial of reasonable religious accommodation claim. Pl.'s Opp. Mem. at 44-46. Rather than respond to the specific arguments made by Defendant, Ms. Britt reiterates the elements of these claims and misstates critical facts in support of her cursory arguments. *Compare* Def.'s Mem. Supp. 30-38 *with* Pl.'s Mem. Opp. at 44-46. Specifically, Ms. Britt principally relies on the proposition that "Defendant would not afford her the [hours modification] accommodation" in support of these claims. Pl.'s Mem. Opp. at 44-46. As discussed supra, this assertion is without merit, as Ms. Wilson granted her religious accommodation request. Wilson-Britt email, ECF No. 9-61. Moreover, it is "well understood in this Circuit that when a plaintiff files an opposition to a motion . . . addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Rodrigues v. Donovan*, 922 F. Supp. 2d 11, 15 (D.D.C. 2013) (citing *McMillian v. Wash. Met. Area Transit Auth.*, 898 F. Supp. 2d 64, 69 (2012). Because Ms. Britt fails to respond to

the arguments set forth by Defendant, the Court need not examine
Ms. Britt's remaining claims in detail.

**IV.   Conclusion**

For the reasons discussed above, Defendant's Motions for
Summary Judgment are **GRANTED.** An appropriate order accompanies
this Memorandum Opinion.


**SO ORDERED.**



**Emmet G. Sullivan**
**United States District Court**
**September 23, 2016**